**IMPERIAL CHEMICAL INDUSTRIES, PLC, Plaintiff,**

v.

**DANBURY PHARMACAL, INC., Defendant.**

Civ. A. Nos. 89–575–CMW, 90–736–CMW.

United States District Court, D. Delaware.

Nov. 4, 1991.

Douglas E. Whitney, Donald F. Parsons, Jr., and Jack B. Blumenfeld of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Donald J. Bird, Stephen L. Sulzer, Lynn E. Eccleston, and Mark G. Paulson of Cushman, Darby & Cushman, Washington, D.C., of counsel), for plaintiff.

Jeffrey M. Weiner, Wilmington, Del. (Alfred B. Engelberg, Greenwich, Conn., of counsel), for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

The plaintiff-patentee Imperial Chemical Industries, PLC ("ICI"), is a British corporation having its corporate offices and prin-

cipal place of business in Imperial Chemical House, Millbank, London, England. Consolidated Pretrial Order ("P.T. Order") filed March 6, 1991 at p. III–1. The defendant Danbury Pharmacal, Inc., ("Danbury"), is a corporation organized and existing under the laws of the State of Delaware having its principal place of business at Stoneleigh Avenue, Carmel, New York. *Id.* ICI has charged Danbury with infringement of ICI's U.S. Patent No. 3,934,032, ("the '032 patent") and Danbury has asserted the invalidity of this patent as an affirmative defense in Civil Action Nos. 89–575 and 90–736.[1] P.T. Order at p. I–1. The subject '032 patent was issued to ICI on January 20, 1976 with two claims directed to a method for the treatment of hypertension in a warm-blooded animal by the administration of a particular alkanolamine derivative.[2] The preferred compound covered by the '032 patent is generically known as "atenolol". P.T. Order at p. I–3.

On June 30, 1989, Danbury filed two abbreviated new drug applications ("ANDAs") Nos. 73–352 and 73–353. The two ANDAs which are the subject of Civil Action No. 89–575, seek authorization from the U.S. Food and Drug Administration ("FDA") to sell a generic version of the drug atenolol in 50 mg and 100 mg tablets, respectively, after the expiration date of the '032 patent. P.T. Order at p. I–2. Atenolol is marketed for the treatment of hypertension by ICI under the trademark TENORMIN. P.T. Order at p. I–3. On September 5, 1989, Danbury amended ANDAs Nos. 73–352 and 73–353 and simultaneously submitted a patent certification which alleged, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii) (1988), that the '032 patent and ICI's U.S. Patent No. 3,836,671 ("the '671 patent")[3] were invalid. Further,

---

**1.** Civil Action Nos. 89–575 and 90–736 were consolidated for all purposes by stipulation of the parties and Order of this Court issued February 19, 1991.

**2.** The '032 patent contains only two claims. Claim 2 is directed to and specifically covers the use of atenolol to treat hypertension. ICI's assertion that claim 1 of the '032 patent was infringed was withdrawn during the trial, leaving

only claim 2 of the '032 patent at issue in this case. Trial Transcript ("Tr.") at pp. 955–56.

**3.** The '671 patent which expired on September 17, 1991, claimed *inter alia,* pharmaceutical compositions containing atenolol as the active ingredient and the use of atenolol to treat angina pectoris. P.T. Order at p. III–1, ¶ 3. By letter to the FDA dated January 4, 1991, Danbury withdrew its challenge to the validity of the '671 patent, and by Stipulation and Order

Danbury sought approval to market atenolol immediately, without regard to the expiration date of the '032 and '671 patents. P.T. Order at p. I-2.

On November 5, 1990, Danbury filed an ANDA (number unspecified) which is the subject of Civil Action No. 90–736, seeking authorization from the FDA to sell a generic version of the drug atenolol/chlorthalidone. P.T. Order at p. I-2. Atenolol in combination with chlorthalidone is marketed for the treatment of hypertension by ICI under the trademark TENORETIC. P.T. Order at p. I-3. Concurrent with the filing of this ANDA, Danbury submitted a patent certification which alleged, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii) (1988), that the '032 patent was invalid, and that Danbury sought approval to market the combined drug atenolol/chlorthalidone commencing September 17, 1991 (after the expiration of the '671 patent) without regard to the expiration date of the '032 patent. P.T. Order at pp. I-2, 3.

Danbury's submission of the ANDAs and the patent certification challenging the validity of the '032 patent, constitutes infringement of the '032 patent under 35 U.S.C. § 271(e)(2)(A) (1988). Danbury has admitted infringement with respect to both atenolol *per se* and atenolol/chlorthalidone combinations, and raised the affirmative defense of invalidity. FDA approval of Danbury's ANDAs could have been effective immediately (assuming the ANDAs are otherwise in compliance with FDA requirements) except that ICI brought suit within forty-five days of its receipt of the patent certification notices.[4] P.T. Order at pp. I-3, 4. Since ICI filed suit within the forty-

five day period,[5] the FDA may not permit Danbury to market its generic drug for a period of thirty months from the date of the receipt of the patent certification notices[6] unless both claims of the '032 patent are finally adjudicated to be invalid before the respective thirty month periods expire.[7] P.T. Order at p. I-4.

This Court has jurisdiction under the United States Patent Laws, Title 35, and under 28 U.S.C. §§ 1331, 1338(a). In addition, this action is authorized under the Food and Drug Law, Title 21, and specifically 21 U.S.C. § 355(j)(4)(B) (1988). Venue is found under 28 U.S.C. § 1400(b) since the defendant Danbury is a Delaware corporation.[8] P.T. Order at p. II-1.

The Court held an eight day bench trial from April 1 through April 5 and April 8 through April 10, 1991. Since Danbury has admitted infringement of the '032 patent and has not engaged in any commercial activity relating to the '032 patent the sole issues for determination at trial were the validity and enforceability of claim 2 of the '032 patent. After trial, the parties submitted proposed findings of fact and conclusions of law. The Court has considered the parties' post-trial submissions along with the testimony and documentary evidence presented at trial. After this review the Court renders this Opinion containing its Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Danbury seeks a declaration that claim 2 of the '032 patent is invalid and grounds its attack on validity upon 35 U.S.C. § 103 (1988) ("section 103")[9] and 35 U.S.C. § 112

signed January 17, 1991, the '671 patent was formally withdrawn from this Action. Claim 2 of the '032 patent is thus the only patent claim in issue in Civil Action No. 89–575. P.T. Order at p. I-3. *See supra* note 2.

**4.** 21 U.S.C. § 355(j)(4)(B)(iii) (1988).

**5.** ICI brought Civil Action No. 89–575 for patent infringement on October 19, 1989. Civil Action No. 90–736 for patent infringement was brought by ICI on December 21, 1990. P.T. Order at p. I-2.

**6.** From September 7, 1989 with respect to atenolol *per se,* and from November 9, 1990 with

respect to the combined drug atenolol/chlorthalidone. P.T. Order at p. I-4.

**7.** 21 U.S.C. § 355(j)(4)(B)(iii) (1988).

**8.** Jurisdiction and venue are admitted by both parties to this Action.

**9.** 35 U.S.C. § 103 (1988) provides as follows:
A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would

(1988) ("section 112")[10]. The basis of Danbury's § 103 defense of obviousness is that "given the scope and content of the prior art, the nature of the differences between atenolol and the prior art and level of skill in the art, a medicinal chemist of ordinary skill in the art in February, 1969 would reasonably have expected that atenolol because of its R–ABC structure and the close similarity of its R group to known R groups would also be a beta-blocker and, therefore, be useful as an antihypertensive agent." Defendant Danbury's Proposed Findings of Fact and Conclusions of Law ("DFC") at p. 32, ¶ 50.

The basis for Danbury's § 112 defense is "the patent specification's alleged failure to disclose adequately to one of ordinary skill in the art 'how to use' the invention without undo experimentation." DFC at p. 71, ¶ 86. It is Danbury's position that "the '032 patent in suit does not disclose, and would not teach, a person of ordinary skill in the art how to use atenolol to treat hypertension in the manner ultimately approved by the FDA[11] [and that] extensive experimentation with atenolol over a period of many years was required by those skilled in the art before they ultimately learned of the possibility of using atenolol to treat hypertension at a dose as low as 100 mg. taken once-a-day." DFC at p. 28, ¶ 44.

ICI counters that "[i]n light of the significant structural differences between atenolol and the prior art, the lack of any teachings in the prior art which would have suggested the modifications required to make atenolol, atenolol's unexpected, qualitatively different combination of pharmacological properties, and its advantages over the prior art in the treatment of hypertension, and the other objective evidence of nonobviousness (*i.e.*, the invention's outstanding commercial success, the pharmaceutical industry's acquiescence in the '032 patent's validity, and Danbury's copying of atenolol), the invention of claim 2 of the '032 patent would not have been obvious to one of ordinary skill in the art when the invention was made on February 21, 1969." Plaintiff ICI's Findings of Fact and Conclusions of Law ("PFC") at pp. 238–39, ¶ 97.

ICI argues in opposition to Danbury's § 112 defense, that "the disclosure of the '032 patent specification would have enabled one skilled in the art, without undue experimentation, to practice the invention of claim 2 and to obtain atenolol's benefits of beta$_1$-selectivity, lack of ISA, and hydrophilicity." PFC at p. 243, ¶ 107.

In the first part of this Opinion, "Findings of Fact", the following areas will be discussed: (a) The Patent In Suit; (b) The Scope and Content of the Prior Art;[12] (c) The Differences Between the Prior Art and the Claimed Invention; (d) The Development of the Patent in Suit; (e) The Level of Skill in the Art; (f) The Teachings of the '032 Patent; (g) Superior or Unexpected Results; (h) The Commercial Records of TENORMIN and TENORETIC. In the second part of this Opinion, "Conclu-

have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

10. 35 U.S.C. § 112 (1988) provides, in pertinent part, as follows:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

11. The FDA approved dosage for atenolol in the treatment of hypertension is 50 or 100 mg. given as one tablet a day. DFC at p. 27, ¶ 42; Defendant's Exhibit ("DX") 530.

12. This section includes subsections which discuss the function, use, development, structure and pharmacological properties of beta-blockers.

sions of Law", the Court will address and state its conclusions of law in reference to the parties' legal theories and the pertinent case law regarding the following issues: (a) Burden of Proof; (b) Obviousness: 35 U.S.C. § 103; and (c) Adequate Disclosure: 35 U.S.C. § 112.

## I. FINDINGS OF FACT

### A. *The Patent in Suit*

The validity of claim 2 of U.S. Patent No. 3,934,032, entitled "Alkanolamine Derivatives for Treating Hypertension" is at issue in this case. This patent was issued to ICI on January 20, 1976 on application Serial No. 461,262 naming Arthur Michael Barrett, John Carter, Roy Hull, David James LeCount, and Christopher John Squire as inventors. Application Serial No. 461,262 was filed on April 15, 1974 as a division of Serial No. 233,781 filed March 10, 1972 (which is now U.S. Patent No. 3,836,671). Application Serial No. 233,781 was, in turn, a continuation-in-part of Application Serial No. 199,011 filed November 15, 1971 (now abandoned) and Application Serial No. 9451 filed February 6, 1970, which issued as U.S.

Patent No. 3,633,607. P.T. Order at p. III–1.

Three separate patents were issued to ICI as a result of restriction requirements by the United States Patent and Trademark Office ("PTO") and double patenting is not an issue in this action. These patents are the expired '607 patent which claims, *inter alia,* atenolol, *per se,* as a chemical compound, the '671 patent which expired on September 17, 1991, and claims *inter alia,* pharmaceutical compositions containing atenolol as the active ingredient and the use of atenolol to treat angina pectoris and the '032 patent. P.T. Order at pp. III–1, 2.

The '032 patent contains two claims which read as follows:

1. A method for the treatment of hypertension in a warm-blooded animal in need of such treatment which comprises administering orally, parenterally or by inhalation to said animal an effective amount of at least one alkanolamine derivative selected from the group consisting of a compound of the formula:

$$R^2-A-\underset{R^3}{\underbrace{\phantom{xxx}}}-OCH_2 . CHOH . CH_2NHR^1$$

wherein $R^1$ is isopropyl or t-butyl, $R^2$ is carbamoyl or alkylcarbamoyl of up to 4 carbon atoms, A is alkylene of 1 to 5 carbon atoms or alkenylene of 2 to 5 carbon atoms and $R^3$ is hydrogen, halogen or alkyl, alkenyl, or alkoxy each of up to 4 carbon atoms: and a non-toxic, pharmaceutically acceptable acid-addition salt thereof.

2. The method of claim 1 wherein the alkanolamine derivative is 1-p-carbamoyl-methylphenoxy-3-isopropyl amino-2-propanol or a non-toxic, pharmaceutically acceptable acid-addition salt thereof.

Claim 2, the only claim at issue in this case, is directed to, and specifically covers the

use of atenolol to treat hypertension. P.T. Order at p. III–2.

### B. *The Scope and Content of the Prior Art*

#### 1. Background Facts

The body's autonomic nervous system prepares it to deal with physical exertion and various stressful and emotional conditions. The autonomic nervous system works through two different systems; the parasympathetic system and the sympathetic system. The relevant focus for this discussion is on the sympathetic nervous system. When this system is activated by impulses it releases certain neurohormones which trigger the release of two neurochemicals, adrenaline and noradrenaline,[13]

13. Adrenaline and noradrenaline are natural or endogenous catecholamines (also called sympa-

thetic amines). P.T. Order at p. III–3. In England these two endogenous catecholamines are

collectively referred to as catecholamines. Adrenaline is released into the bloodstream and noradrenaline is released at the nerve endings. Thadani, Tr. at p. 21; P.T. Order at p. III–3.

These catecholamines act at structures called receptors which lie on the cell surface of almost all organs and systems in the body. There are two kinds of receptors which are designated as alpha-receptors and beta-receptors. Our focus for purposes of this case is on the beta-receptors.[14] The interaction between the catecholamines and the receptors produce a response in the associated cells and organ to facilitate the body's reaction to physical and emotional stress. Thadani, Tr. at pp. 21–23.

When the beta-receptors are stimulated by the catecholamines, they produce a response in the heart in that they increase the force and rate of contraction of the heart which increases the blood flow from the heart (cardiac output). In addition, stimulation of the beta-receptors causes dilation of the arteries to the heart and the peripheral arteries so more blood can be accommodated in these vessels and dilation of the bronchial passages so that the flow of air to and from the lungs is enhanced and thus the flow of blood to critical organs and muscles is facilitated. Thadani, Tr. at pp. 21–23; P.T. Order at p. III–3.

### 2. The Function and Use of Beta–Blockers

Claim 2 of the '032 patent claims a method of use of the compound atenolol in the treatment of hypertension. Atenolol is a beta-blocker. P.T. Order at p. III–3. At trial, Danbury's expert witness on the clinical uses of beta-blockers, Dr. Thadani,[15] described the function of a beta-blocker. He explained that beta-blocker drugs are synthetic chemicals which have a similar structure to the naturally occurring catecholamines and can, therefore, occupy a receptor site and block the catecholamine's reaction with the receptor site.[16] By blocking the catecholamines from interacting with the receptor site, the beta-blockers decrease heart stimulation because the stimulating effects of the catecholamines which normally would increase the force and rate of contraction on the heart are reduced. This reduction in the force and rate of the heart's contraction then lowers

referred to as epinephrine and norepinephrine. Loev, Tr. at p. 299.

**14.** The beta-receptors are located on the heart muscle, in the blood vessels and in the bronchial muscles. Thadani, Tr. at p. 22.

**15.** At present Dr. Thadani is a Professor of Medicine at the University of Oklahoma, and Vice Chief of the Section of Cardiology where he is involved with patient care, the supervision of students, residents and cardiology fellows and research in the evaluation of cardiovascular drugs. From 1969 until 1975 Dr. Thadani's research was primarily concerned with the evaluation of beta-blocker drugs in patients with angina pectoris and hypertension. In 1975, Dr. Thadani continued some work on beta-blocker drugs but the major emphasis of his research was on the evaluation of drugs called nitrates, which are vasodilators used widely in the management of patients with angina pectoris. For the last four years Dr. Thadani has been evaluating calcium channel blockers which are agents used to treat both angina pectoris and hypertension and various other disorders. Thadani, Tr. at pp. 8, 12–13.

In evaluating various cardiovascular agents Dr. Thadani would write protocols for studies of these drugs in human patients and would administer these drugs to patients in double blind studies and examine the effect of treatment with these drugs in the patients by a comparison to the results with a placebo. Dr. Thadani is the author of a publication entitled "Beta–Blockers and Hypertension" which is a review article on the use of beta-blockers and hypertension up to the year of publication in 1983 in the American Journal of Cardiology. This article reviewed all of the relevant published literature on studies of beta-blockers and hypertension. Dr. Thadani is also the co-author of a chapter entitled "Beta-blocking Agents" appearing in DX 524 which is the 1984 edition of Professor Opie's book, *Drugs for the Heart,* and a chapter of the same title appearing in DX 525, a 1987 second expanded edition of Professor Opie's book. Thadani, Tr. at pp. 12–14, 15–18.

**16.** Stimulants or agonists (such as adrenaline) and beta-blockers or beta-antagonists (such as atenolol), compete for occupancy of the receptors. Therefore, the higher the concentration of agonist in the blood stream, as during times of stress and exertion, the greater the proportion of beta-receptors that will be stimulated by the agonist, rather than blocked by the antagonist. However, the relative level of stimulation achievable by the agonists is lessened by the presence of the beta-blocker. P.T. Order at p. III–4.

the oxygen demands of the working heart. Thadani, Tr. at pp. 25, 26.

This blockade by a beta-blocker is competitive in that total or complete beta-blockade is never achievable since the inhibitory effect of the beta-blocker or beta-antagonist can always be overcome by increasing the concentration of the endogenous catecholamine or agonist. Nevertheless, the level of the body's response to the endogenous catecholamines is lessened by the presence of a beta-blocker. This lessened response is desirable under certain circumstances. P.T. Order at p. III–3–4.

When a person is exercising or experiencing a stressful situation the heart muscle will be stimulated by the release of adrenaline and noradrenaline, as described previously, and it will pump harder in order to accommodate the increased demands for blood flow and oxygen by the muscles. Under normal circumstances this response by the heart is tolerable but in certain situations such a response can be detrimental. For example, in a patient with angina pectoris the coronary arteries which supply blood to the heart muscle are narrowed with fatty deposits or cholesterol accumulation. When the patient exercises the heart is being stimulated and is trying to contract faster but the blood flow cannot increase because the arteries are narrowed and the patient experiences chest pain. A beta-blocker can be used in a patient with angina pectoris to decrease the stimulation of the heart thereby reducing the force and rate of contraction of the heart and lowering the oxygen demands of the heart. Thadani, Tr. at pp. 25, 26.

In addition, beta-blocker drugs are useful for the treatment of hypertension. Hypertension is a condition of increased blood pressure.[17] At trial Dr. Thadani testified that beta-blockers lower blood pressure in about sixty percent of hypertensive patients but that the manner in which they accomplish this, even at present, is not known. Thadani, Tr. at p. 28.

Dr. Thadani testified at trial that the functions and uses of beta-blockers, outlined above, were all known prior to February of 1969.[18] Thadani, Tr. at p. 29. Dr. Thadani supported this statement by referring to several prior art articles that he had read and was familiar with and by indicating as to each article any reference it had to a description of the general function and uses of beta-blockers. As to the uses of beta-blockers he specifically identified those articles which mentioned the use of beta-blockers for the treatment of hypertension.

Dr. Thadani discussed DX 504 at trial which is a 1966 article by Doctors Epstein and Braunwald entitled "Beta–Adrenergic Receptor Blocking Drugs: Mechanisms of Action and Clinical Applications" published in the New England Journal of Medicine. The first part of this article describes how beta-blockers function and their effect on various parameters such as heart rate. On page 1179 of this article appears a discussion of the use of beta-adrenergic receptor drugs (beta-blockers) for the treatment of hypertension. In this discussion of hypertension the article makes reference to a 1964 article by Dr. Brian Prichard entitled "Hypotensive Action of Pronethalol" published in the British Medical Journal. Dr. Thadani also referred to this article which is PX 26. Thadani, Tr. at pp. 29–31, 33.

In this article (PX 26), the hypertensive action of a beta-blocker known by the name of "pronethalol" was described. Dr. Prichard found that this beta-blocker drug low-

17. A person with a blood pressure which falls outside of the blood pressure range representing the blood pressures of ninety percent of the population, which can be considered the normal range, is said to have high blood pressure or hypertension. What is considered to be normal blood pressure will vary with different age groups. An individual's blood pressure can vary from day to day and even within the same day, depending on the existing circumstances when the reading is taken. The individual's emotional state and whether he has smoked a cigarette or had a cup of coffee prior to the reading can vary one's blood pressure. The reading can also vary depending on the investigator or physician taking the reading. Dr. Thadani Tr. at pp. 26, 27.

18. The '032 Patent claims priority for the filing of a foreign application. An application was filed in the United Kingdom on February 21, 1969. Plaintiff's Exhibit ("PX") 6.

ered the blood pressure in patients with hypertension. Further work on pronethalol was discontinued when experiments in mice showed that it produced carcinogenic effects. However, on page 1228 of PX 26, Dr. Prichard does state that "when a non-carcinogenic beta-receptor-blocking drug is produced it would be worth trying in the treatment of hypertension." Thadani, Tr. at pp. 33–34.

The Epstein and Braunwald article (DX 504 referred to previously) at p. 1179 states that Prichard's observations contained in his 1964 article (PX 26) were extended to another beta-blocker, "propranolol" which was found to be effective as a blood-pressure-lowering agent. Dr. Thadani also referred to Dr. Prichard's work with propranolol at trial, in discussing PX 314 a 1969 article co-authored by Dr. Prichard and Dr. Gillam entitled "Treatment of Hypertension with Propranolol" published in the British Medical Journal. Dr. Thadani stated that this article's authors found that propranolol, a beta-blocker, was effective in the treatment of hypertension. Thadani, Tr. at 35–37.

Dr. Thadani also referred to DX 505 at trial, a 1969 article by Dollery entitled "Clinical Pharmacology of Beta-receptor-blocking Drugs". This article discusses and describes the clinical pharmacology, properties, function and uses of beta-block-

ing drugs. The fifth section of the article which deals with the clinical use of beta-blocking drugs, describes the value of these drugs in the treatment of hypertension as giving rise to controversy (at page 785) and indicates that further work will need to be done in order to define the position of beta-blocking drugs in such treatment (at page 787). The article does, however, offer a thorough review of the studies concerned with the blood pressure lowering effect of beta-blocking drugs, and many of the cited studies show successful results. Dr. Thadani characterized this article as describing what he and other physicians were aware of at this time, in 1969, as to beta-blocker drugs. Thadani, Tr. at pp. 31–33.

The Court finds that it was known prior to February of 1969 not only how beta-blockers functioned but that they could be used to lower blood pressure.

3. The Development of Beta–Blockers

In 1948 Dr. R.P. Ahlquist published a paper describing the effect of sympathetic amines (two endogenous catecholamines, adrenaline and noradrenaline, and four synthetic analogues, one of which was isoprenaline) in producing responses in a variety of different animal tissues. The chemical structures of adrenaline, noradrenaline and isoprenaline are as follows:

Noradrenaline

Adrenaline

Isoprenaline

All three compounds have a benzene ring on which hydroxyl (–OH) groups are substituted at the 3– and 4– positions, and an ethanolamine side-chain at the 1–position. The only difference in structure between these three compounds is the amino group of ethanolamine side-chain. P.T. Order at p. III–6–7.

Upon finding that there were two distinct rankings of relative potency of these sympathetic amines for producing responses depending on the organs tested, Dr. Ahlquist concluded that there were two distinct types of adrenoceptors in the body which could be affected by this class of compound. He referred to these as alpha and beta adrenoceptors. Dr. Ahlquist

found that beta-receptors were associated with most of the inhibitory functions such as dilation of the vascular system and inhibition of the bronchial muscles and one excitatory function that of myocardium or heart muscle stimulation. Isoprenaline was found to stimulate these beta-receptors the most, followed by adrenaline and then noradrenaline which stimulated the beta-receptors the least. P.T. Order at p. III–7–8.

In 1958, a report was published by Eli Lilly showing that certain adrenoceptors in animals could be blocked by a chemical compound known as dichloroisoprenaline (DCI). The structure of DCI is as follows:

**Dichloroisoprenaline**     $Cl-\langle\rangle-CH(OH)-CH_2-NH-CH(CH_3)_2$

As in adrenaline, noradrenaline and isoprenaline, DCI has a benzene ring with an ethanolamine side-chain at the 1–position. Unlike the other three compounds, DCI is substituted at the 3– and 4– positions with chlorine (Cl) instead of hydroxyl groups. However, DCI has the same amino group of the ethanolamine side-chain as isoprenaline, a hydrogen and an isopropyl group. P.T. Order at p. III–8.

With the discovery of DCI, the classification scheme of alpha and beta, adopted by Dr. Ahlquist for adrenoceptors, became more widely accepted and was extended to certain drugs which were classified as either alpha or beta according to the type of receptor for which they had the greatest affinity. Thus, DCI was described as a "beta-adrenergic blocking drug" in 1961

and was the first beta-blocker discovered. P.T. Order at p. III–8.

In 1958, Dr. J.W. Black, who had been working on drug treatments for angina pectoris [19] suggested an alternative approach to the treatment of angina pectoris. He suggested reducing the stimulation of the heart so that the heart would need less oxygen. Aware that stress, either emotional or exercise-induced, played a role in bringing about an angina attack and that the release of noradrenaline (from the nerve endings adjacent to the heart muscles) and adrenaline (into the bloodstream from the adrenal gland) acted to stimulate the heart by stimulating the beta-receptors, Dr. Black suggested that by blocking the beta-receptors in the heart muscle the

**19.** A condition associated with a deficiency in the supply of oxygen to the muscles of the heart. Treatment at this time was primarily aimed at increasing the supply of oxygen to the muscles of the heart by using coronary vasodilator drugs. Vasodilator drugs cause dilation of the blood vessels supplying blood and hence oxygen to the muscles of the heart. P.T. Order at pp. III–9–10.

harmful effects of this stimulation could be overcome. P.T. Order at pp. III–9–10.

DCI as a beta-blocker with the ability to block beta-receptors from stimulation by adrenaline and noradrenaline had the potential of being the type of drug that could be used to treat angina pectoris in the alternative way suggested by Dr. Black. However, DCI was found to be a very potent beta-agonist in that it had a strong stimulating effect on the same beta-receptors that it blocked such that it was considered an unsuitable drug for use in the treatment of angina. This led Dr. Black and his colleagues at ICI in 1958 to begin searching for a beta-blocker free from the stimulating effect possessed by DCI. P.T. Order at p. III–10.

In 1960, Drs. Black and Stephenson of ICI discovered, pronethalol, the first clinically useful beta-blocker. The chemical structure of pronethalol is as follows:

**Pronethalol**

$CH(OH)-CH_2-NH-CH(CH_3)_2$

A comparison of the structural formulae of pronethalol, DCI, isoprenaline, adrenaline and noradrenaline reveals that each possesses an ethanolamine side chain and that the differences among these compounds include differing amino group substituents of the ethanolamine side chain (hydrogen, methyl and isopropyl), differing ring systems (benzene and double or naphthyl ring structures) and differing substituents on their respective ring structures when comparing DCI and pronethalol with each other and with the sympathetic amines, adrenaline, noradrenaline and isoprenaline. It is these differences that account for the significantly different behavior and clinical utility of these drugs. P.T. Order at p. III–10–11.

Pronethalol was fully developed through pre-clinical testing and clinical trials which showed it to be a successful beta-blocking drug in the treatment of angina pectoris by improving these patients exercise tolerance, though a fairly high dose was needed. These results seemed to support Dr. Black's hypothesis of an alternative treatment approach for angina. P.T. Order at p. III–11.

As discussed previously in reference to Px 26, Dr. Prichard found that pronethalol also had blood pressure lowering capabilities. The use of pronethalol, however, was associated with various side-effects, mostly of central nervous system ("CNS") origin, which seemed unrelated to its beta-blocking effect. Its use was further complicated by its carcinogenic potential in humans such that in 1965 it was withdrawn from human use. P.T. Order at p. III–11–12.

In 1962 propranolol, another beta-blocker drug, was discovered. This compound proved to be not only successful in clinical use, but safe. The structural formula of propranolol is as follows:

**Propranolol**

$OCH_2-CH(OH)-CH_2-NH-CH(CH_3)_2$

Propranolol has a naphthyl ring structure like pronethalol but unlike pronethalol, between the ring and the ethanolamine group (–CH(OH)–CH2–NH–CH(CH3)2), propranolol has an oxymethylene group –(OCH2) to form an "oxypropanolamine" group. This oxypropanolamine group was found to give rise to compounds 10–20 times as potent as the corresponding ethanolamine analogues. Propranolol was fully developed through preclinical testing and clinical trials and, in 1965, ICI commenced selling propranolol and it became important in the treatment of hypertension and angina. P.T. Order at p. III–12.

The history as to the development of beta-blockers further supports the Court's finding that it was known prior to February, 1969 that beta-blocker drugs functioned to block beta-receptors from the stimulating effects of adrenaline and noradrenaline and that these drugs could be used successfully to treat hypertension.

### 4. The Structural and Pharmacological Properties of Beta–Blockers

Atenolol is a novel compound. P.T. Order at p. III–17. Atenolol is a beta-blocker.

P.T. Order at p. III–3. ICI contends that the use of atenolol, acknowledged to be a novel compound and a beta-blocker, in the treatment of hypertension is not obvious in view of the prior art. ICI supports this position primarily by focusing on the structural differences between atenolol and the prior art beta-blockers. ICI claims that the prior art would not have suggested the modifications necessary to make atenolol and that the combination of pharmacological properties possessed by atenolol are unexpected and qualitatively different. Based on the findings discussed in the following sections "a" through "e" of this Opinion, the Court is convinced that ICI's reliance on structural differences is without merit.

### a. The Common Molecular Structure of Beta–Blockers

The prior art includes numerous patents and publications which discuss the structural features of beta-blocker compounds. The basic molecular structure of these compounds can be represented as follows:

: R : A : B : C :

: : : : :

R

OCH₂—CH(OH)–CH₂–NH—CH(CH₃)₂

made up of the following chemical groups or moieties:

"A" represents an aryl (an aromatic ring structure) which, as material to this discussion, may be either a benzene ring (a pheynl group) or a naphthalene ring (a naphthyl group), or a heterocyclic group such an indole ring, as in pindolol;

"B" represents oxymethylene group (–OCH₂–) which may, but need not, be present for beta blocking activity;

"C" represents an ethanolamine group (–CH(OH)–CH₂–NH–), wherein the amine (NH–) may, but need not, be attached to an isopropyl group (–CH(CH₃)₂), as shown;

"R" represents one or more substituents which may be attached to the aryl group at one or more positions which are labeled on the benzene ring—the 2- and 6- positions are also termed "ortho", the 3- and 5- positions "meta", and the 4- position "para";

"BC" collectively represents an oxypropanolamine group ($-OCH_2-CH(OH)-CH_2-NH-CH(CH_3)_2$), wherein, as shown, the amine is optionally attached to an isopropyl group, but may alternatively be attached to a t-butyl group;

"AC" collectively (without "B") would represent an arylethanolamine; and

"ABC" collectively represents an aryloxy-propanolamine.

P.T. Order at p. III; ¶ 8. This molecular structure is shown on Px 871.

The following are among the specific beta-blocker structures which are prior art with respect to atenolol.[20]

Propranolol (Appears on PX 872)

Toliprolol (Appears on PX 872)

Oxprenolol (Appears on PX 873)

Alprenolol (Appears on PX 873)

Pindolol (Appears on PX 874)

Practolol (Appears on PX 874)

---

At trial Dr. Loev, an expert in medicinal chemistry for Danbury,[21] was asked to explain the relationship, if any, between the compounds shown on exhibits Px 872

20. At trial Mr. Engelberg, the attorney representing Danbury in this action noted, for the record, that all of the compounds appearing on PX 872, PX 873 and PX 874, with the exception of the compound known as bupranolol which appears on the top of PX 874, are identified in the agreed statement of facts in the pretrial order as compounds which were known in the prior art. Loev, Tr. at p. 286.

21. Dr. Loev's present occupation is that of a consultant to the chemical and pharmaceutical industries and various universities. Dr. Loev was employed with Smith, Kline and French (now Smith, Kline and Beckman) from 1958 until 1975. During the years from 1958 until February 1969, Dr. Loev was involved in drug development primarily in the cardiovascular and the central nervous system areas.

In the area of cardiovascular drug development Dr. Loev's focus was on different mechanisms for lowering blood pressure. He was personally involved in the design and synthesis of the compounds which were to be tested. Specifically, Dr. Loev worked with beta-blockers doing structure activity studies to determine the effect that variations in the chemical structure of a compound would have on its biological properties.

For the next six years at Smith, Kline and then at Revlon (starting in 1975), although at the management level, Dr. Loev continued to

through PX 874 and the general structure shown on PX 871. Dr. Loev testified that the structure on PX 871 shows a generic structure for beta-blocker compounds and that the letters which are used above the different parts of the structure, "R" and "A" and "B" and "C" are a shorthand to represent different parts of the molecule. He further explained that the structures on PX 872, PX 873 and PX 874, all fit within the general structure shown on PX 871. In reference to Claim 2 of the '032 Patent Dr. Loev stated that atenolol fits within the R–ABC generic structure shown on PX 871. Loev, Tr. at pp. 287–96.

At trial Dr. Loev reviewed several prior art publications which discuss the general structure of the class of compounds known as beta-blockers.[22] In summary he stated that the publications discuss what PX 871 illustrates about structure of the beta-blocker compounds and that many of the publications even use the same R–ABC shorthand to identify the structure. Dr. Loev testified that "[i]n general [these prior art publications] say that for a substance to be a beta-blocker it will have a

structure corresponding to R–ABC, in some cases using those [specific] identifiers, otherwise showing the structure identical to what is [in PX 871] and saying that this is the general structure." Loev, Tr. at p. 297.

In addition to examining the prior art publications Dr. Loev examined and discussed several prior art patents in reference to the common structure of beta-blocker compounds.[23] Based on his review of the prior art patents Dr. Loev estimated that thousands of different beta-blocker compounds having the R–ABC structure are disclosed. He further stated that these compounds differ very little from one another and that they all conform to the R–ABC structure. Dr. Loev proceeded to go through each of the prior art patents he examined, indicating for the Court where each patent disclosed a beta-blocker having the R–ABC structure. Loev, Tr. at pp. 312–344. The Court will not reiterate Dr. Loev's remarks as to each patent since it was made evident to the Court at trial that these prior art patents do refer to a common structure, possessed by the beta-blocker compounds, though not always represented by the R–ABC shorthand.[24]

maintain extensive involvement in the design and development of cardiovascular drugs. He participated in the development of a beta-blocker drug while at Revlon called celebralol, sold under the name Selectrol, which is awaiting FDA approval for sale in the United States. Loev, Tr. at pp. 246–55; DX 501.

**22.** Dr. Loev looked at DX 536 which is a 1967 publication by Ariens, from the Annals of the New York Academy of Science entitled "The Structure–Activity Relationships of Beta Adrenergic Drugs and Beta Adrenergic Blocking Drugs". Dr. Loev stated that this article indicates that the endogenous (naturally occurring) catecholamines and the beta-blocker compounds have essentially the same structure. Dr. Loev explained that isoproterenol was used experimentally for convenience but that it is identical in substance to the endogenous compounds, adrenaline and noradrenaline. Dr. Loev characterized the structural relationship between the endogenous catecholamines and the beta-blocker compounds as being very close. It was his opinion that this structural similarity was the reason why the beta-blockers were made and why they fit the receptor site so well. Table 2 on page 609 depicts a variety of beta adrenergic blocking drugs and isoproterenol as representative of the endogenous catechola-

mines. In reference to this table, Dr. Loev indicated that even "grossly looking at [these structures] they all have the [R–ABC] general structure indicated on PX 871." Loev, Tr. at pp. 297–300.

**23.** Dr. Loev examined prior art patents disclosing beta-blockers which are identified by the following exhibit numbers. DX 554—DX 560, DX 562–570, DX 574–577, DX 581, and DX 586. Loev, Tr. at pp. 312–343.

**24.** In addition to Dr. Loev's testimony concerning the common structure possessed by the known prior art beta-blockers, there was testimony to this same effect from Dr. LeCount, Professor Rees and Professor Hirschmann, all of which were called as witnesses by ICI.

Dr. David James LeCount was called as a fact witness by ICI. He has been employed by ICI Pharmaceuticals as a research chemist since 1964. He is identified as an inventor on the '032 patent. When shown PX 871, which shows the basic molecular structure of the beta-blocker compounds, Dr. LeCount agreed that the generic structure shown on PX 871 was the structure for the beta-blockers known to him prior to the time he commenced the work leading to atenolol. He further agreed that he was aware that all of the known prior art beta-

## b. *The Necessary Molecular Structure of Beta–Blockers*

The common generic structure, often times represented by the shorthand R–ABC, associated with the beta-blocker compounds in the prior art is also *necessary* in that it enables the compound to act as a beta-blocker. Several prior art publications were introduced at trial which analyzed the structure-activity relationship of beta-blockers and defined the necessary structural elements for this class of compounds.

Dr. Loev testified at trial, in reference to DX 536, a 1967 publication by Ariens entitled "The Structure Activity Relationships of Beta Adrenergic Drugs and Beta Adrenergic Blocking Drugs", that the very close structural relationship between the endogenous catecholamines, adrenaline and noradrenaline, and the compounds identified as beta-blockers, both of which fit the R–ABC structure, explains why the beta-blocker compounds are able to fit the beta-receptor site so well. Dr. Loev next summarized what DX 538, a 1966 publication by Brand-strom, et al. entitled "Synthesis of some B-adrenergic blocking agents", disclosed with respect to the relationship between structure and activity in beta-blockers. He stated that the authors indicated a standard hypothesis in drug-receptor research was that one part of the molecule is responsible for combining with the receptor, the attachment part, while another part is responsible for producing the stimulation effect.

At trial, Dr. Loev focused on the drug-receptor reaction that occurs with a beta-blocker drug. He explained that the beta-blocker compound comes to the receptor site (the beta-receptor) and combines with the site. Specifically, the oxypropanolamine side chain portion of the beta-blocker compound reacts with the beta-receptor site and acts to attach the compound to the site. The other part of the beta-blocker compound, the "RA" portion, sticks out and physically blocks the site thus preventing the endogenous substances from getting into that site to react and cause beta-stimulation.[25] Loev, Tr. at pp. 298–305.

blockers possessed the R–ABC structure shown on PX 871 and that for those that did not it was the "B" part of the structure, the oxymethylene (OCH2) group, which was lacking. He was aware, however, that this group may, but need not, be present for beta-blocking activity. He also agreed that the prior art beta-blocker compounds listed on exhibits PX 872–874 (except for bupranolol which is not a prior art beta-blocker) were all known to him before he began his work on atenolol. LeCount, Tr. at pp. 484–86.

Professor Charles W. Rees was called as an expert witness in organic chemistry by ICI. At present he is a Hoffman Professor of Organic Chemistry at the Imperial College of Science, Technology and Medicine at the University of London and has occupied this position for twelve years. Professor Rees has also been consulting actively since 1965 in the areas of medicinal chemistry, photographic chemistry, and agrochemistry for various companies. At trial Professor Rees agreed that based on his review of the prior art, the majority of the known beta-blockers fit within the R–ABC structure shown on PX 871. Rees, Tr. at pp. 536–41, 684–85; PX 71.

Professor Ralph F. Hirschmann was called as an expert witness in medicinal chemistry by ICI.

He is currently a Research Professor of Chemistry at the University of Pennsylvania and holds a concurrent appointment at the Medical University of South Carolina in Charleston, as a University Professor of Bioorganic Chemistry. At trial he agreed that if one took into account the definitions on PX 871, the R–ABC structure is the appropriate generic structure established *in the prior art before February 1969* as a structure common to all known beta-blockers. Professor Hirschmann also agreed that if he gave one of his chemistry students, in February 1969, the assignment of reviewing the literature and providing him with a generic definition of compounds coming within the class known as beta-blockers, the student would have handed him PX 871. Hirschmann, Tr. at pp. 713–14, 872–73; PX 72.

25. This description concerning the functions of the different parts of the molecule are described in DX 538. Loev, Tr. at pp. 302–3. Dr. Loev also referred to the following figure, which appears as Figure 1 at the top of page 17D in DX 529, a 1982–1983 article from the American Journal of Cardiology, as illustrative of his testimony about the relationship between the various parts of a molecule and the ability to bind to a receptor and block or stimulate that receptor.

The Court finds that a compound must possess the requisite molecular structure to be capable of acting as a beta-blocker and that the generic structure denoted by the shorthand R–ABC was both the *common* and *necessary* molecular structure possessed by the beta-blocker compounds known in the prior art. Specifically, a prerequisite for beta-blocking activity was an ethanolamine "C" group connected to an aromatic ring "A" preferably linked by an oxymethylene (OCH2–) bridge "B". The oxymethylene bridge "B" was not necessary for beta-blocking activity but, when present, was found to give rise to compounds 10 to 20 times as potent. P.T. Order at pp. III–5, 12. The ethanolamine side chain was believed to be responsible for a beta-blocker's affinity to the beta-receptor site while the "R–A" portion physically blocked the endogenous substances from reacting with the receptor site.

### c. *Variation in the "R–ABC" Structure*

The way in which the prior art beta-blocker compounds (see the structures illustrated in section I.B.4.a.) differ is in their respective "R" group substituents or their aromatic ring structures, the "A" group. At trial Dr. Loev presented four exhibits (590A–D) which he had prepared to illustrate the diversity of R group substituents that had been used and reported in beta-blocker compounds prior to 1969. Dr. Loev used prior art publications and patents (referenced on each exhibit for each structure appearing on the exhibit) in preparing these exhibits.

DX 590A focuses on aryl ring variations and shows the variety of different ring systems that have been used which fit the R–ABC beta-blocker structure. DX 590B illustrates R group variations which are all attached to the ring by a methylene group (CH₂) or methylene bridge. All of these fit the R–ABC beta-blocker structure. DX 590C illustrates a variety of structures containing the "R" group substituent of an amide functional group, an amide. Each of these compounds shown on DX 590C has either front to back or back to front the (CONH) or (CONH₂) groupings. All of these are amides. DX 590D illustrates miscellaneous "R" group variations, little groups, big groups, reactive and nonreactive groups, which do not fit into any particular category and further shows the wide diversity of "R" groups which appear in beta-blocker compounds. Loev, Tr. at pp. 345–49.

These exhibits, prepared by Dr. Loev from the prior art patents and publications, show that wide variations in the "R" group substituent can be tolerated while retaining beta-blocking activity. This level of modification in the "R" group is possible since the "BC" portion of the beta-blocker structure was generally believed to be responsible for the affinity or binding of the beta-blocker compound to the receptor site while the "R" or "RA" portion of the structure resulted in various pharmacological profiles. Loev, Tr. at pp. 297–375.

Dr. Loev testified that it would be a reasonable expectation of a person of ordinary skill in the art that compounds pos-

Dr. Loev explained that the top portion of the figure shows the conceptualization of the endogenous substances, using the molecule isoprenaline as a mimic of the natural substances, reacting with the receptor site by illustrating binding with the right-hand portion of the molecule and a reaction with the left-hand portion. He explained that the lower part of this figure

shows the structure of "propranolol" a beta-blocker compound, binding on the right hand side, the "ABC" portion, and thus attaching the molecule to the receptor site while the left-hand portion of the molecule, the "RA" portion, is blocking the receptor site. Loev, Tr. at pp. 303–5.

sessing the R–ABC beta-blocker structure would have not only a reasonable likelihood, but a very high likelihood of possessing beta-blocking activity. Further, it was Dr. Loev's testimony, based on his readings, that the pharmacological implication flowing from this property would be antihypertensive activity. Loev, Tr. at pp. 354–56. The Court agrees and finds that there would be a high expectation that a compound of the R–ABC beta-blocker structure would possess beta-blocking activity and thus blood pressure lowering capabilities.

### d. *Secondary Pharmacological Properties of Beta–Blockers*

In the prior art publications which analyzed the structure-activity relationships of beta-blockers it was generally believed that the ethanolamine side chain, the "C" group, preferably linked by an oxymethylene (OCH2–) bridge "B" to the aromatic ring "A", was responsible for establishing the affinity or binding between the beta-receptor and the beta-blocker compound. The "R" or "R–A" substituent, which in the endogenous catecholamines causes stimulation by reacting with the receptor site and in the beta-blocker compounds physically blocks the site, was believed to be responsible for the presence or absence of certain secondary pharmacological properties. P.T. Order at p. III–17; DX 529, DX 505, DX 535, DX 536, DX 538, DX 539; Loev, Tr. at pp. 298–306.

The ancillary pharmacological properties associated with the beta-blocker compounds, in addition to their beta-adrenergic receptor blocking activity, include cardioselectivity, intrinsic sympathomimetic activity ("ISA") and membrane stabilizing activity ("MSA"). By 1967 it was a generally accepted practice to classify the beta-blockers by the ancillary pharmacological properties which they possessed. P.T. Order at pp. III–13–15.

Cardioselectivity refers to the preference or selectivity certain beta-blockers demonstrate for the beta-receptors predominantly located in the cardiac muscle, called beta$_1$-receptors, as opposed to those beta-receptors, referred to as beta$_2$-receptors, predominantly located in the muscles of the peripheral vascular or bronchial systems.[26] Thus, the beta-blocking effects on the muscles in the peripheral vascular or bronchial system are significantly reduced with a cardioselective beta-blocker.[27] Beta-blockers which are cardioselective are referred to as being beta$_1$-selective. ISA, also known as partial agonist activity or PAA, refers to the fact that some beta-blockers provide some degree of stimulation to the beta-receptor while simultaneously blocking that receptor from stimulation by the endogenous catecholamines. P.T. Order at pp. III–13–15.

Variations in the "R" or "RA" portion of the R–ABC beta-blocker generic structure could be expected to produce a compound possessing beta-blocking activity and some combination of the secondary pharmacological properties associated with the beta-blocker compounds as described above. The only structural difference between the cardioselective prior art beta-blocker, practolol, and the non-selective prior art beta-blockers such as alprenolol and oxprenolol is the nature of the "R" group substituent. In addition, the only structural difference between the prior art beta-blocker propranolol which lacks ISA and the prior art beta-blockers oxprenolol and alprenolol which possess ISA is the nature of the aromatic ring "A" and the "R" group substituent. P.T. Order at p. III–17.

### e. *Beta–Blockers as a Class of Compounds*

It is the Court's finding that the beta-blocker compounds define a class of compounds and that atenolol's inclusion in this class is appropriate. The prior art patents

---

**26.** There are also beta$_1$-receptors located in the peripheral vascular or bronchial systems, although in fewer number than the beta$_2$-receptors. Likewise, there are beta$_2$-receptors located in the cardiac muscle but in fewer number than the beta$_1$-receptors. P.T. Order at p. III–15, note 3.

**27.** Cardioselective beta-blockers are "selective" rather than "specific" for the beta$_1$-receptor, and at high enough doses they will tend to block not only the beta$_1$-receptors, but also the beta$_2$-receptors. P.T. Order at p. III–15, note 3.

and publications along with the expert testimony given at trial, all discussed in the proceeding sections I.B.4.a. through d., support the Court's characterization of the beta-blocker compounds as a class. All three chemical experts, Dr. Rees, Dr. Hirschmann and Dr. Loev, and the co-inventor on the '032 Patent, Dr. LeCount, appear to recognize that there was an established class of chemical compounds known as aryloxypropanolamines and that this class was known to possess beta-blocking activity in conjunction with other common characteristics. Loev, Tr. at pp. 286–311; LeCount, Tr. at pp. 484–86; Rees, Tr. at pp. 684–85; Hirschmann, Tr. at pp. 872–73.

The prior art teaches the way in which this class of compounds functions and the uses for this class of compounds.[28] In addition, it is apparent to the Court that the prior art teaches that there were certain common and necessary structural elements which the prior art beta-blockers possessed that enabled this class of compounds to perform the function of a beta-receptor blockade.[29] The review of the prior art further reveals that as long as the necessary structure was maintained, wide variations of the non-requisite structural elements of this class of compounds could be tolerated.[30] These variations would not result in a loss of beta-blocking activity but only in a variety of secondary pharmacological properties exhibited by the class of compounds of beta-blockers.[31]

Atenolol is a novel compound and admittedly does possess structural differences from the prior art beta-blockers, but it is still a beta-blocker and a member of this class of compounds. Atenolol retains the generic structure *common* and *necessary* to the class' function. Atenolol's structural variation appears only in the non-requisite portions of the molecule which results in its combination of secondary pharmacological properties.[32]

## C. *Differences Between the Prior Art and the Claimed Invention*

Atenolol possesses the common and necessary R–ABC structure of the class of beta-blocker compounds known to possess beta-blocking activity. Atenolol is a novel compound. It differs from the prior art compounds by the structure of its "R" group only or by the structure of its "A" group in addition to its "R" group. Through the testimony of Dr. Loev it was seen that a wide variation in the structure of the "R" group can be tolerated with a retention of beta-blocking activity such that there is an expectation that almost any "R" group would result in a beta-blocker. P.T. order at pp. III–15, ¶ 26 and III–17, ¶ 30; Loev, Tr. at pp. 297–375. This expectation of beta-blocking activity is further enhanced if the modifications in the "R" group substituent are minor such as where an "R" group structure close to that of a prior art "R" group is retained.[33] Such is

28. *See* discussion *supra* parts I.B.1. and 2.

29. *See* discussion *supra* parts I.B.4.a. and b.

30. *See* discussion *supra* part I.B.4.c.

31. *See* discussion *supra* part I.B.4.d.

32. There was no beta-blocker known prior to atenolol which was cardioselective but lacked ISA. Propranolol was not cardioselective and had no ISA. Alprenolol, oxprenolol, and pindolol were non-cardioselective but possessed ISA. Practolol and acebutolol were cardioselective and possessed ISA. P.T. Order at p. III–15.

33. ICI sought to show that such an expectation did not exist through the testimony of its expert witness Dr. Rees. ICI's expert witness, Dr. Charles Rees, discussed the steric properties of a compound, those properties that are spatial and relate to a compound's shape and size and the electronic properties of a compound, those that are determined by the nature and character of the electrons in a compound and their movement within the compound. He then discussed how these properties define the physical and chemical properties of a compound which in turn define its biological properties.

It was his opinion that the steric and electronic properties of a particular beta-blocker have a significant impact on the its actual functioning. Rees, Tr. at pp. 546–47. In support of this opinion Dr. Rees engaged in a lengthy discussion of the basics of organic chemistry underlying these concepts. He presented an illustrated talk which included the alkanes, alkenes, cycloalkanes and aromatic rings with references to their respective reactivity, the various functional groups and their association with the chemical reactivity and planarity of a structure, the concept of the inductive effect (an unequal sharing of electrons in a single bond, see PX

**348**

the case when atenolol is compared to the prior art beta-blocker practolol. At trial Dr. Loev demonstrated by using three dimensional scale models, the very similar size and shape of these two compounds. Loev Tr. at pp. 272–82, 375–85.

Atenolol and practolol are structural isomers in that they each have the same number of carbon, hydrogen, nitrogen and oxygen atoms. They each have the identical aryloxypropanolamine structure, the common and necessary "ABC" structure of the class of beta-blockers. They differ in structure in their respective "R" group substituents at the para position on the aryl ring. The "R" group of each is an acetamide ($CH_3$–CO–$NH_2$–) but in the case of atenolol this group is linked to the aryl ring, the "A" group, through a methyl ($CH_3$) group and in the case of practolol, the acetamide is linked to the aryl group through an amino (NH) group. Dr. Loev explained that if one were seeking a cardioselective beta-blocker the fact that practolol possessed an amide (NH–CO) functional group as its "R" group and it was cardioselective, the expectation would be that retention of such an amide group would result in a cardioselective beta-blocker and, if one were asked to get a beta-blocker, you could "stick almost anything

[in the R group position.]" Loev, Tr. pp. 397–98. P.T. Order at p. III–18, ¶ 31; Loev, Tr. at pp. 297–375; Rees, Tr. at p. 636; DX 596; DX 600.

The expectation of beta-blocking activity is also enhanced if modification to the "R" group is in accord with the guidelines developed for "isosteric" and "bioisosteric" replacements.[34] These established replacements are published into tables. Such a table appears on page 75 of DX 545[35] as table 8–I. According to this table a known isosteric replacement is the substitution of $CH_2$ for NH or $NH_2$ for $CH_3$. Such exchanges would result in atenolol from practolol. As Dr. Loev testified, these tables have limits since it is recognized that there is no guarantee that a particular molecular modification will produce a desired result. However, it is reasonable, in the case of a beta-blocker compound, where the prior art discloses such compounds as possessing "R" groups which vary greatly in steric and electronic configurations, that an "R" group selection which results in a compound that is isosteric or isomeric with known beta-blockers having established activity, that the likelihood of beta-blocking activity is greater than if the "R" group is selected at random. Loev, Tr. at pp. 273–77, 374–378.

866) and the conjugative effect (an actual flow of electrons from one part of the compound to another). Rees Tr. at pp. 585–606.

Dr. Rees' testimony did establish that the electronic and steric properties of the substituent parts of the various beta-blockers under consideration in this case are indeed different, but he never commented as to the significance of these differences on biological activity or the expectation that a compound would be beta-blocker. In his review of the prior art Dr. Rees focused on the similarities and differences in chemical structure and did not attempt to assess the relationship between chemical changes and biological properties in the prior art. All Dr. Rees would say is that in his opinion any change in the structure of a chemical compound will result in an unpredictable change in the biological properties though he could not comment on the expectation of biological activity associated with such a change in structure. Rees Tr. at pp. 687–89.

Dr. Rees, however, did agree that every steric or electronic difference will not necessarily result in a biological difference. Rees Tr. at p. 691. He further agreed that it is evident from

the prior art that the "R" group can tolerate a very wide range of functions and still get some beta-blocking activity even though the "R" groups of the prior art compounds exhibit steric and electronic differences. Rees Tr. at p. 697. In particular, Dr. Rees agreed that many of these prior art "R" groups exhibit large steric and electronic differences, larger in many cases than the differences between practolol and atenolol. Rees Tr. at 693–94.

**34.** These concepts are discussed and defined *infra* part I.E.2. of this Opinion which discusses the methodology employed in drug research. Generally these concepts involve substituting one atom, or group of atoms, in a compound which possesses the desired properties, a "lead compound", with atoms of a similar steric or electronic configuration in hopes that the desired properties will be retained. Loev, Tr. at pp. 272–82, 375–85.

**35.** DX 545 is a textbook published in 1960, entitled "Medicinal Chemistry" by Alfred Burger, a Professor of Chemistry at the University of Virginia.

The Court is aware that the prior art patents do not actually disclose the specific molecular modifications required to synthesize atenolol from any prior art beta-blocker, including practolol (which is considered to be the closest prior art by ICI). (PFC at p. 55). The Court can't agree, however, with ICI's position that the general prior art gave *no* guidance to persons of ordinary skill in the art seeking to make a new beta-blocker. Loev, Tr. at 411; PFC at p. 59. The Court finds that the physical and chemical relationships between atenolol and the prior art beta-blockers (i.e. the common and necessary R–ABC structure and an "R" group substituent structurally related to known beta-blockers with activity [36]), would enhance the expectation, in 1969, that atenolol would be an active beta-blocker and, thus, a member of the recognized class of beta-blocker compounds disclosed in the prior art as having antihypertensive utility. Loev Tr. at pp. 272–82, 375–85.

### D. *The Development of the Patent in Suit*

#### 1. ICI's Research Interests and Goals

In 1968, ICI's cardiovascular team's research included research into beta-blockers. When Dr. LeCount, a co-inventor of the '032 patent, joined the Pharmaceutical Division of ICI this research involved exploration of the chemistry of compounds related to the prior art beta-blocker, practolol. Practolol is a cardioselective beta-blocker which has ISA. The interest at ICI, and one of Dr. LeCount's goals, was to find a beta-blocker that was cardioselective, like practolol, but which lacked the ISA of practolol. At this time, however, it was not clear whether the presence or absence of ISA was desirable. Thus one of the objectives in making a cardioselective

beta-blocker without ISA was to permit clinical evaluation of the effectiveness of this combination of properties. LeCount, Tr. at pp. 476–484, 489, 497, 499–504. No beta-blocker existed in the prior art which had cardioselectivity but lacked ISA to serve as a reference. P.T. Order at p. III–15.

In reference to the upper left hand drawing on PX 892, Dr. LeCount explained that the changes to the practolol compound being explored at ICI included those positions marked as follows: 1) "R", which indicates the terminal amino group on the oxypropanolamine side chain; 2) "$R_1$", which indicates the terminal portion of the practolol side chain; and 3) "$R_2$", which indicates other substituents at various positions on the aryl ring. He also explained that the ($-NHCOR_1$) group (of the practolol compound) was being kept constant in an effort to retain its overall properties while attempting to enhance its level of activity. Research was also being done to explore changes in the prior art beta-blocker propranolol, in which the double ring structure was held constant while variations were made to other parts of the molecule. LeCount, Tr. at pp. 497, 499–503.

Throughout his testimony Dr. LeCount referred to the "practolol series" when discussing the research involved in making the above modifications to the practolol compound, and to the "propranolol series" in reference to the modifications being made to the propranolol compound. He concluded from the prior work in modifying practolol and propranolol that the desired "series" of improved beta-blocker would not be found in either the propranolol series or the practolol series, but that it would be necessary to devise a new series having the most desirable properties of each. Af-

---

**36.** Dr. Loev explained that he would have expected a structure such as atenolol to have beta-blocking activity for the following three reasons. First, due to the fact that almost any "R" group put in the "ABC" structure leads to a compound with activity, there would be a high likelihood that any new substituent in the "R" group position would also result in a compound having activity. Second, as is shown on DX 590C there is a whole diverse group of com-

pounds with the amide structure of atenolol and all of these are beta-blockers such that another compound which was created that contained an amide group would also have such activity. The third reason given by Dr. Loev is the indication from DX 590B that almost anything can be put on the CH2 group, a methylene group of which atenolol possesses, with a retention of activity. Loev, Tr. at pp. 374–76.

fidavit of David James LeCount (DX 503) at p. 34, ¶ 42.

The Court does not agree with Dr. Le-Count's characterization of the prior art compounds as belonging to different series. The Court has found that they are all part of the class of compounds of beta-blockers for which the prior art defines a generic structure and the permissible modifications that can be made to this structure without a loss of beta-blocking activity. In fact, Dr. LeCount was aware of the teachings of the prior art relating to beta-blocker structures and recognized that because his objective was to make a beta-blocker the R–ABC structure would have to be retained since it was a prerequisite to obtaining a compound which possessed beta-blocking activity. Also based on his knowledge of the prior art, Dr. LeCount believed that the R group was the only part of the molecule that could potentially make a difference with respect to cardioselectivity since he knew that the only structural difference between the cardioselective prior art beta-blocker, practolol, and the non-selective prior art beta-blockers, alprenolol and oxprenolol, was the nature and location of the "R" group substituent on the "A" ring. These are the very portions of the structures of practolol and propranolol that the ICI work, discussed above, centered on. LeCount, Tr. at pp. 482, 486–90.

In the Court's view, Dr. LeCount's description of the ICI research team's goal as a departure from the "practolol series" with the objective of finding a new series, is misleading. This characterization creates the impression that in embarking on the synthesis of a new beta-blocker with the desired combination of properties, that the prior art with respect to the chemical structure of beta-blockers created no expectation that a new compound, with the R–ABC structure and an "R" group close to that of prior art "R" groups, would be a beta-blocker. The Court is convinced that this was not the case.[37] In fact, to the contrary, ICI's focus in synthesizing a new beta-blocker was on modifications of the "R" group of practolol. This is hardly a major departure from what is disclosed in the prior art to warrant classifying the resulting compound as a member of a "new series". Dr. LeCount described the rationale which led to the synthesis of atenolol as follows:

> "Clearly, it is a simple matter to synthesize a molecule that looks like a beta-adrenoceptor blocking agent, and not too difficult to synthesize one that is active.... The only difference between the selective practolol and its nonselective relatives was the presence of the acetylamino group in practolol; therefore it was toward this group that our attention turned."

LeCount, Tr. at pp. 482, 488–89; DX 532 at p. 126.

### 2. The Synthesis of Atenolol By ICI—A Chance Discovery

It is contended by ICI that the compound that became atenolol was not the target of the synthesis intended by Dr. LeCount and Dr. Hull.[38] It is asserted that the biological activity of atenolol was purely a chance discovery.[39] LeCount, Tr. at pp. 515–517;

---

**37.** ICI's chemical experts also sought to create the impression that the knowledge of the prior art with respect to the chemical structure of beta-blockers was insufficient to create any general expectation that modification of the "R" group of the R–ABC structure would produce a useful beta-blocker.

**38.** Dr. Hull was the head of the chemistry section at ICI in which Dr. LeCount worked.

**39.** Dr. Rees explained by reference to the drawings on exhibit PX 902, the hypothesis Drs. Hull and LeCount had concerning the synthesis of a new cardioselective beta-blocker. Dr. Rees explained that their hypothesis centered on the hydrogen attached to the nitrogen in the acetamido of practolol with the thought that this might be the structural feature related to the selectivity of practolol's biological action. Rees, Tr. at pp. 607–08.

Practolol      $CH_3$-CO-NH-⟨ ⟩-$OCH_2$-CH(OH)-$CH_2$-NH-CH$(CH_3)_2$

Rees, Tr. at pp. 613–14, PX 82. Further, it is asserted that making the structure of atenolol would have been inconsistent with Dr. LeCount's goal, because if he was trying to disclose acidity on the carbon adjacent to the aromatic ring, it would not have been sensible to have amide hydrogens present nearby, as is the case in the structure of atenolol. This is because amide hydrogens are inherently more acidic, since they are hydrogens on nitrogen as opposed to hydrogens on carbon. Rees, Tr. at p. 614.

The Court does not see the significance to be given to ICI's assertion that atenolol was a chance discovery. Atenolol fits the R–ABC structure of the class of beta-blocker compounds. The net result of the synthesis of atenolol was a compound in which there is a modification of the "R" portion of the generic R–ABC structure of prior art beta-blockers. In fact, if the "R" group of practolol is turned around, the resulting compound is atenolol.[40] As discussed previously, the prior art publications and patents and the opinion of Dr. Loev based on these prior art items, shows that there was a recognized class of beta-blocker compounds having a generic R–ABC structure in which a diverse array of "R" groups could be put into the R–ABC structure and beta-blocking activity still retained. It was also disclosed in the prior art (and discussed previously), that compounds of this class were useful antihypertensive agents. Therefore, a determination as to whether atenolol resulted from an unintended synthesis route or was simply the rearrangement of the "R" group of an existing prior art beta-blocker is not a necessary finding this Court must make in deciding this case.

### E. The Level of Skill in the Art

Atenolol possesses an aryloxypropanolamine group, the "ABC" structural component of the generic beta-blocker structural formula. The "AC" portion is required for beta-blocking activity and the "B" portion, the oxymethylene bridge, is desirable as it is attributable to additional potency. Atenolol differs from the prior art beta-blockers in the structure of its "R" group and/or in the modification of the "A" group. Structural differences in the nature of the aromatic ring "A" and the "R" group substituent distinguish a cardioselective prior art beta-blocker from a non-selective one, specifically cardioselective practolol and non-

---

This hydrogen is acidic and gains its acidity from the adjacent carbonyl group. Since the nitrogen has free electrons which it likes sharing with other parts of the molecule, and oxygen likes collecting electrons, there is a flow of electrons from the nitrogen toward the oxygen, giving the hydrogen a partial positive charge, and the oxygen a partial negative charge. LeCount, Tr. at pp. 507–11; Rees, Tr. at pp. 608–09; PX 894; PX 893. In efforts to maintain this acidic hydrogen which formed the basis of Dr. LeCount's hypothesis, it was proposed that the amide nitrogen be replaced by a carbon. However, since carbon is not as willing as nitrogen to give up its electrons, it was further proposed to place two electron withdrawing groups on the carbon such that there would be a flow of electrons away from the hydrogen. Thus a small positive charge would be conferred on the hydrogen atom and a negative charge would be shared between the two oxygen atoms. LeCount, Tr. at pp. 512–14; Rees, Tr. at pp. 608–09; PX 894; PX 869. In addition, the aromatic ring adjacent to the carbon would provide additional inducement to the hydrogen to ionize thus, giving it a partial positive charge. Rees, Tr. at p. 609; Px 869.

In carrying out this proposal an unintended reaction occurred during the chemical conversion aimed at assembling the oxypropanolamine side chain which required that a protecting group be inserted in efforts to mask the ester group of the molecule from the unwanted reaction with isopropylamine. LeCount, Tr. at pp. 515–16; Rees, Tr. at pp. 612–13; PX 902. It was Dr. LeCount's intention to then carry out the chemical conversion to form the oxypropanolamine side chain and then remove the protecting group. LeCount, Tr. at pp. 515–16; Rees, Tr. at pp. 613–14; PX 895. However, when the intermediate compound which existed prior to the removal of the protecting group and the conversion back to the originally intended ester, was tested, it was found to be an active compound. Further, it was cardioselective and lacked ISA. This intermediate compound later became known as atenolol. LeCount, Tr. at pp. 515–17; PX 895.

**40.** When Dr. LeCount was asked whether he ever considered simply turning the "R" group of practolol around, as an obvious route to atenolol, as suggested by Danbury, he answered no. LeCount, Tr. at p. 520. The Court does not dispute that this route may not have been considered and does not make a finding as to whether it was considered or not.

selective alprenolol and oxprenolol and a prior art beta-blocker lacking ISA from a beta-blocker possessing ISA, specifically ISA lacking propranolol and ISA possessing oxprenolol and alprenolol. P.T. Order at p. III–17, ¶ 28, ¶ 29. Therefore, it was apparent that variations in the nature of the "A" portion and the "R" portion of the beta-blocker basic molecular structure, R–ABC, could result in beta-blockers with varying pharmacological profiles. P.T. Order at p. III–5, ¶ 8; p. III–17, ¶ 29. Therefore, the level of ordinary skill in the art in this case involves the research and development of beta-blockers for use in the treatment of hypertension as of February, 1969, since the claimed invention is a method for the use of a novel beta-blocker compound, atenolol, for treating hypertension. P.T. Order at p. IV–4, ¶ 14; p. III–3 at ¶ 7; p. III–17 ¶ 30.

### 1. A Medicinal Chemist

ICI was interested in developing a beta-blocker with varying pharmacological properties from the prior art beta-blockers when atenolol was discovered. ICI sought to develop a beta-blocker which was cardioselective like practolol but, unlike practolol, lacked ISA. LeCount, Tr. at pp. 478–84. Therefore, a determination of how to modify the "R" and "A" portions of the R–ABC structure of existing beta-blockers was required in order to produce a beta-blocker compound with the desired properties. The Court finds that the art involved in such a determination and thus of the invention in the '032 patent is that of medicinal chemistry and that the person of ordinary skill in the art would be a medicinal chemist. Loev, Tr. at pp. 350–52; Hirschmann, Tr. at p. 839.

The person of ordinary skill in the art would be an individual with a PhD degree in organic chemistry, with an emphasis in medicinal chemistry (i.e. the application of

organic chemistry to the development of pharmaceutical products), who would have some experience with the development of beta-blockers, and would be thoroughly familiar with the prior art which discusses the structure-activity relationships of the existing beta-blockers and have knowledge of the methodologies of drug development (i.e. lead following, isosterism, and bioisosterism, discussed in the following section of this Opinion). Loev, Tr. at pp. 282–85; Hirschmann Tr. at pp. 726–28.

ICI has asserted that the level of ordinary skill in the art involved in the research and development of beta-blockers for use in the treatment of hypertension as of February, 1969, would be that possessed by a hypothetical person or team having a PhD in organic chemistry and advanced degrees in pharmacology and medicine. P.T. Order at IV–4, ¶ 14. The Court does not agree that either a team or an individual possessing the above advanced degrees, in addition to a PhD degree in organic chemistry, is necessary. The educational degree of necessity for developing a new beta-blocker compound for hypertension, would be in organic chemistry as applied to pharmaceutical product development (medicinal chemistry) since the alteration of a requisite and common chemical structure is involved in achieving this invention. Guidance from other individuals with degrees in pharmacology and medicine could be accessible and useful to this medicinal chemist for obtaining information from a clinician's point of view as to optimal properties. The medicinal chemist himself, however, would not need to possess this additional training in order to pursue the necessary development work.[41]

Dr. LeCount, a co-inventor of the '032 patent, is himself an individual with a PhD degree in organic chemistry who fits the other criteria the Court has assigned to the level of ordinary skill in the art in this case.

---

**41.** PX 307, a 1970 book by Burger, entitled "Medicinal Chemistry" at page 307 states that "close collaboration among chemists, biologists and clinicians is most conducive to making novel drug discoveries." This statement indicates to the Court that collaboration of individuals possessing the advanced degrees urged by ICI may occur and be most desirable. However, it

is not essential that the level of ordinary skill in the art for our purposes be characterized as a "team" possessing these degrees. There are smaller institutions of research than ICI that may not have the resources to devote such a team to this type of work and would still be able to achieve the desired results.

Dr. LeCount's reliance on input from biologists and physicians is the type of guidance foreseen by the Court and does not alter the characterization of the level of ordinary skill in the art as previously described. Hirschmann, Tr. at pp. 726–729; LeCount, Tr. at pp. 451, 453–54, 466, 469, 493–500.

### 2. Methodology Employed in Drug Research

Prior to 1969 two strategies were known with respect to drug development. These two strategies were referred to as "lead-seeking" and "lead-following". The lead-seeking strategy is employed when a researcher's area of interest is new and no useful compounds for treatment have previously been found. Thus, there exists no class of compounds or specific compounds which are effective and the aim under this strategy is to find a prototype compound, a first compound, which is effective. Once a compound is found it must be screened to determine if it possesses the desired activity. If it is active, which many times the compounds are not, it is then subjected to in-depth evaluation to determine if it has problems with side effects, toxicity, potency etc.[42] Loev, Tr. at pp. 261–62; DX 597.

The other strategy called lead-following, is a later step after the lead-seeking stage. This strategy involves taking a prototype or lead compound which has been found and following it and modifying it in an attempt to get rid of certain deficiencies it may have and improve it. In doing this, one makes other compounds related to this lead compound, such as analogs and homologs. Any of these related compounds will have to be screened initially for activity. Even though a lead compound or prototype which possesses activity is being followed, it does not necessarily mean that the related compound will also be an active compound. However, there is a reasonable likelihood that active compounds will be produced since a lead compound which possesses activity is being followed. Once this strategy produces an active molecule, further modifications will most likely be necessary because this compound will still have certain deficiencies or not meet the researcher's criteria for one reason or another. Continual modifications, with subsequent screenings for activity, will occur until a compound is produced which is determined to be suitable for marketing or the search following this lead compound is abandoned. Loev, Tr. at pp. 262–64; DX 597.

Prior to 1969, the lead-following strategy was the more common strategy in the development of drugs. Loev, Tr. at p. 264. A 1960 textbook entitled "Chemobiodynamics and Drug Design" (DX 550) by F.W. Schueler, PhD, states at page 405 that "[t]he most widely used mode of approach today in the design of new drugs devolves upon the use of some drug of known structure as a model or prototype from which congeners,[43] or homologues[44] and analogues[45] are designed." In explaining why this approach is so widely used Dr. Schueler states:

This mode of approach while offering a wide scope to creativity also has certain outstanding practical advantages. Thus the fact that one is designing from a known biologically active prototype is re-

---

**42.** Dr. Loev testified at trial concerning the topic of drug development strategies and, specifically, the knowledge as to this topic prior to 1969. Dr. Loev lectured on this topic throughout the sixties and continued to do so afterwards at various universities and throughout the world. To assist him in his testimony on this subject Dr. Loev referred to DX 597, a document he had prepared in conjunction with one of his previous lectures, which illustrates the general approach used by Dr. Loev and other experts in the field to arrive at a desired compound or modify a compound in hopes of improving its profile. Loev, Tr. at pp. 259–61.

**43.** In footnote one, on page 405 of this textbook, congeners are defined as substances literally generated or synthesized by essentially the same synthetic chemical reactions and the same procedures.

**44.** Footnote one on page 405 of this textbook states that "[c]ongeners as defined are, strictly speaking usually essentially the same as homologues; i.e., both represent sets of entities arising in essentially the same way."

**45.** Footnote one at page 405 of this textbook describes analogues as substances that are analogous in some respect to the prototype agent in chemical structure.

assuring to the designer (and his financial supporters) in that drug activity of the desired type is known to be possessed by at least one structure. Also, since it has seldom if ever been found (at least upon prolonged investigation) that any biologic response is triggered solely by one molecular species, the designer can with a high degree of expectation utilize the method of variation, [lead-following][46] to formulate additional products that may be as valuable as the prototype, or even superior pharmacologically to it in some regards.

F.W. Schueler, PhD, *Chemobiodynamics and Drug Design,* (1960) at p. 405.

There were general rules prior to and as of February, 1969, that were used in the lead-following strategy. Loev, Tr. at p. 270. One approach is that of "isosteric replacement". "This requires substitution of one atom or group of atoms in the parent compound for another, with a similar electronic and steric configuration." (DX 545 at p. 72)[47] Dr. Loev described this approach as involving the replacement of one group that you believe to be important by another group of the same physical size. Loev, Tr. at p. 275.

Another approach is the "bioisosteric approach". Dr. Loev described this approach as involving known replacements of certain atoms or chemical portions of a molecule with other atoms such that there is high likelihood of retaining similar biological activity. Loev, Tr. at pp. 275–76. At trial, Dr. Loev referred to Table 8–I of biosteric groups in DX 545, on page 75, which indicates in each column the groups that can be used to replace another group in the same column with a reasonable likelihood of getting activity. Loev, Tr. at p. 276. There were other prior art references pro-

duced at trial which discuss the approaches of isosterism and bioisosterism and give tables similar to the one in DX 545. Loev, Tr. at pp. 277–282; DX 546; DX 549; DX 551.

The Court finds that the "lead-following" strategy along with its concepts of isosterism and bioisosterism was the basic technique employed in the pharmaceutical industry when searching for new compounds or products with improved properties prior to the discovery of atenolol. Dr. Loev and Professors Rees and Hirschmann agree that this stategy would have been used by a person of ordinary skill in the art who was looking for a new cardioselective beta-blocker. Each of these chemical experts also acknowledges that the compound practolol, a prior art cardioselective beta-blocker, would have been used as a lead compound in employing the lead-following strategy in search of a new cardioselective beta-blocker since it possessed the desirable property of cardioselectivity. Loev, Tr. at p. 384; Rees, Tr. at pp. 663–68; Hirschmann, Tr. at pp. 720, 819.

### F. *The Teachings of the '032 Patent*

#### 1. Claim of Use for Hypertension

ICI filed the initial patent application for the patent in suit, in February, 1969, which claimed the use of atenolol to treat hypertension in warm-blooded animals.[48] Dr. LeCount agreed that as of February 1969, when this initial patent application was filed, resulting in the patent in suit,[49] that neither he nor anyone else at ICI had conducted a single test in man or animal which demonstrated that atenolol was able to lower blood pressure. The only tests which had been conducted with atenolol as of

---

**46.** Dr. Loev testified that what Dr. Schueler calls the "method of variation" he called "lead-following" and that each of these terms describes the same approach to drug development. Loev, Tr. at pp. 264–65.

**47.** DX 545 at page 72. This is an excerpt from the second chapter of a textbook entitled "Medicinal Chemistry," Second Edition, edited by Alfred Berger, Professor of Chemistry, University of Virginia, dated 1960. Dr. Loev described Professor Berger as the father of medicinal

chemistry since he had been in the field so long and was the first to systematize and organize the field.

**48.** PX 1, the now expired U.S. Patent 3,363,607, claims the chemical compound known as atenolol.

**49.** The '032 patent is derived from a continuation-in-part patent application which was filed in November, 1971.

February, 1969, were experiments designed to illustrate its beta-blocking activity and the ancillary properties of ISA, cardioselectivity and MSA. None of these tests measured the ability of atenolol to lower blood pressure. LeCount, Tr. at pp. 449–450; PX 1.

The '032 patent states that atenolol along with the other compounds claimed in the patent can be used in man for the treatment of hypertension. It further states the dose ranges for such treatment. The '032 patent (PX 3) at column 5, line 54, describes the disease states and dose ranges with respect to atenolol and the compounds of Claim 1. Since ICI, admittedly had done no testing on atenolol for its use in lowering blood pressure, it was Dr. LeCount's belief that the above doses were based on what was known about the clinical use of the prior art beta-blockers, propranolol and pronethalol, which were known to be useful in the treatment of hypertension. Thus, the hypertensive use claim for atenolol would appear to be based on a reasonable expectation that as a beta-blocker it would have the same capability to lower blood pressure as the prior art beta-blockers. At trial, Dr. LeCount was quite reluctant to respond to questions concerning such an expectation. He claimed that the dosage and use aspects of the patent were not his part of the invention nor his responsibility and thus, he did not know from where this information was obtained. LeCount, Tr. at pp. 450–57.

As a co-inventor of this patent and a chemist thoroughly familiar with the invention and the prior art, the Court believes Dr. LeCount's position is unrealistic. The Court is of the opinion that Dr. LeCount would be able to agree that an expectation as to the use of atenolol for hypertension existed. The abstract of the now expired U.S. Patent 3,633,607, which claims the chemical compound known as atenolol states that "[t]his invention relates to new alkanolamine derivatives which possess beta adrenergic blocking activity and which are *therefore*, useful in the treatment or prophylaxis of the heart diseases, for example angina pectoris and cardiac arrhyth-mias and in the treatment of hypertension and phaeochromocytoma in man." PX 1. (emphasis added). When confronted with this statement Dr. LeCount did ultimately agree that because the compounds in the patent, which specifically include atenolol, were beta-blockers his feeling was that they would be useful in the treatment of hypertension. LeCount, Tr. at pp. 458–59.

### 2. Dose Ranges

The patent in suit (PX 3, at column 5, line 54) contains a statement with respect to the recommended dose of atenolol in the treatment of hypertension which states:

"When the alkanolamine derivatives of the invention are to be used in man, for example for the treatment of heart diseases such as angina pectoris and cardiac arrythmias, or for the treatment of hypertension or phaeochromocytoma, it is expected that they would be given at a total oral dose of between 25 mg and 1,200 mg daily, preferably between 200 mg and 600 mg daily, at doses spaced at 6–8 hourly intervals, or at an intravenous dose of between 1 mg and 40 mg, preferably between 5 mg and 25 mg. Preferred oral dosage forms are tablets or capsules containing between 25 and 200 mg and preferably 100 mg of active ingredient."

The FDA approved dosage for atenolol in the treatment of hypertension in DX 530, which is the FDA approved label for TENORMIN (atenolol), states that "[t]he initial dose of TENORMIN is 50 mg given as one tablet a day either alone or added to diuretic therapy. The full effect of this dose will usually be seen within one to two weeks. If an optimal response is not achieved, the dosage should be increased to TENORMIN 100 mg given as one tablet a day. Increasing the dosage beyond 100 mg a day is unlikely to produce any further benefit."

The doses recommended in the '032 patent are much higher than those doses which have been approved by the FDA. It was Danbury's expert's opinion that there is nothing in the entire patent, PX 3, that suggests or relates to selecting the doses for cardioselectivity in the manner approved by the FDA. The dosing informa-

tion contained in the patent (preferred dose 200 to 600 mg./day) is much higher than the approved dose. There is also nothing in the '032 patent that suggests using atenolol once a day in the treatment of hypertension. Actually what the patent discloses conflicts with the idea of using atenolol once a day in the treatment of hypertension since the patent says it should be given every 6 to 8 hours which would be three to four times a day. Thadani, Tr. at pp. 141–45. It is Danbury's position that the '032 patent does not contain an adequate disclosure to enable persons skilled in the art to use the invention and select a dose for atenolol in the treatment of hypertension that is cardioselective.

After review of the documentary evidence produced by Danbury in support of this position and evidence offered by ICI in support of the contrary position, the Court must agree with Danbury's position. As discussed below the documentary evidence relied upon by ICI's expert witness, Dr. Cruickshank,[50] to support his opinions, is in many cases irrelevant and some cases contrary to his opinion testimony.

ICI's position is that atenolol has been demonstrated to be significantly cardioselective and effective in the treatment of hypertension throughout the entire dose range of 25 mg to 1,200 mg daily as claimed in the '032 patent and that this range includes the FDA approved dose range of 50 to 100 mg/day which is now generally used and acknowledged by Danbury to be cardioselective. Dr. Cruick-

shank testified at trial that in his opinion atenolol would be effective in the treatment of hypertension at a total daily dose of 25 milligrams in some patients. Cruickshank, Tr. at p. 1071. The Court believes the operative word is "some" in reference to patients. The study, PX 234, relied on by Dr. Cruickshank as confirmation of this opinion is, in the Court's view, of very little relevancy and support to Dr. Cruickshank's statement.[51]

Dr. Cruickshank also testified at trial that, in his opinion, atenolol is effective in its treatment of hypertension at doses up to 1200 milligrams per day. Cruickshank, Tr. at p. 1072. To confirm his opinion Dr. Cruickshank relied on a report by his colleague, Dr. Zacharias, PX 140, entitled "Atenolol in Hypertension: A Study of Long–Term Therapy", published in 1977. This study appears to the Court to offer little support to Dr. Cruickshank's opinion for two reasons. First, the report states that with only a few patients were doses larger than 1000 mg/day used. Second, the study ultimately found that increasing the dose of atenolol beyond 100–200 mg/day does not usually add to the efficacy of the treatment and due to the antihypertensive dose curve of atenolol, the result is a smaller range of effective dosage as compared with propranolol. As a matter of fact, the ultimate finding of this report would tend to support the idea that the high dose range disclosed in the '032 patent reflects the thinking at that time, the dose-response of atenolol being similar to pro-

**50.** Dr. Cruickshank was called as an expert witness in cardiology by ICI. Presently, he conducts his medical practice at Wythenshawe Hospital and is a Senior House Officer at the National Heart Hospital in London. He also is a cardiovascular consultant which included full time employment with ICI in this capacity from January 1, 1974 until June of 1990 mainly in the area of the development of beta-blockers which included a particular association with atenolol. While employed by ICI he in conjunction with Dr. Brian Prichard wrote a book entitled "Beta-blockers in Clinical Practice" (PX 208). He currently receives a pension and consulting fees from ICI.

**51.** PX 234 is a study by Hansson et al., entitled "Long–Term Trial of Atenolol in Hypertension" published in December of 1977. As the title

indicates, and the context of the paper confirms, the purpose of this study was to evaluate long-term effects, mainly side effects, of atenolol when given to patients for up to four years. The study was not aimed at evaluating the effectiveness of a 25 mg/day dose of atenolol in the treatment of hypertension. Furthermore the average daily dose was 174 mg. Admittedly the range of doses given for this average daily dose was 12.5 to 600 mg/day but there is no indication on any of the tables of data what patients were given what doses. Each table simply states the average daily dose which, in fact, was never lower than 152 mg. The presentation of data in this study was not aimed at producing nor segregating data as to the effectiveness of a daily dose of 25 mg/day in the treatment of hypertension.

pranolol. As such, increasing the dose of atenolol would lead to the conclusion that its antihypertensive effect would increase since this was known to be true with propranolol.

Several studies presented at trial confirm this idea and discuss the finding made as to atenolol which ultimately resulted in its generally used dose range of 50–100 mg/day given in a single dose. A study, entitled "Atenolol in Hypertension: a double-blind comparison of the response to three different doses", PX 141, authored by Zacharias, Hayes and Cruickshank and published in 1977 states that "[w]hen we first began to investigate the antihypertensive properties of atenolol, we assumed that there would be a dose-response relationship similar to that seen with propranolol. Accordingly, we started at a low dose and built it up fairly quickly ... However, there were indications both from our own studies and from others ... that the antihypertensive dose-response curve of atenolol reaches a plateau much sooner than we had expected...." (PX 141 at p. 114). The investigators were able to reduce the dose of atenolol in the majority of their high dose patients without a compromise in the control of their blood pressure. Thus, they set out to test the hypothesis that small doses of atenolol are as effective as large ones. The conclusion reached was that for the majority of patients "doses of atenolol in excess of 100 mg/day confer no additional benefit in terms of antihypertensive action." (PX 141 at p. 115).[52]

A study published in 1977 by Dr. Harry of ICI not only established the possibility of a lower dose and once-a-day dosing but revealed the discovery which made such a dosing regimen possible and effective. Dr. Harry found that even though the half life of beta-blockers is too brief to give good blood levels after 24 hours, the duration of their hypotensive action is not equally brief. It was discovered that the plasma half-life[53] of a beta-blocker was exceeded by the pharmacological half-life[54] of a beta-blocker. (PX 153; PX 208). In other words, the blood pressure lowering effect of a beta-blocker persisted for a long time after the concentration of a beta-blocker in the bloodstream had disappeared.

It is evident to the Court that the disclosure of the '032 patent does not teach a person of ordinary skill in the art how to select a cardioselective dose for the treatment of hypertension. The evidence presented in this case shows that it was not until 1976, after atenolol had been in clinical use for four years and after much experimentation had been done with it, that it was learned that atenolol could be used to treat hypertension with a once-a-day dose as low as 100 mg.[55]

At trial, however, Dr. Cruickshank testified that the patent in suit would teach him how to select a dose of atenolol that would be beta–1 selective. He stated that the patent teaches him that atenolol has beta–1 selective properties, that he should start with a dosage which is low and slowly build up the dosage in order to obtain the opti-

---

**52.** PX 150, another study in which Zacharias was involved, entitled "Comparison of propranolol and atenolol in hypertension", published in 1977, confirms the prior belief that the dose response curves of the two drugs, propranolol and atenolol, were the same. However, it became known to the investigators, as a result of this study, that atenolol differs greatly from propranolol both in its metabolism and in its dose response curve. The authors admit that when they started to look at atenolol on a long term basis they naturally adopted the same principle of dose titration (a method where one starts drug therapy with a very low dose of an agent and slowly builds up the dose until the goal blood pressure is achieved or until some adverse reaction occurs. (Cruickshank, Tr. at pp. 1073–74)) as they had used with propranolol

and it soon became apparent to them that atenolol was quite different from propranolol and that its effective dose range was much narrower. PX 150 at p. 113.

**53.** The plasma half-life relates to the disappearance of the drug from the blood. Cruickshank, Tr. at p. 1078.

**54.** The pharmacological half-life is a biological measure and relates to the activity of the drug at tissue level. Cruickshank, Tr. at p. 1079.

**55.** PX 208, a book co-authored by Dr. Cruickshank, confirms that the first published study indicating that a beta-blocker could be given once daily was in 1976. PX 208 at p. 378.

mal anti-hypertensive therapy and stop if an adverse reaction, such as bronchial asthma, occurred. He also stated that the patent taught him that as a beta-1 selective agent there would be no interference with the beta$_2$ receptors except at higher doses selectivity would tend to be lost and the beta-2 receptors would be occupied to a degree. Cruickshank, Tr. at pp. 1081-84.

Dr. Cruickshank testified that the disclosure is for one skilled in the art to find the selective dose for atenolol through the use of dose titration which, in his opinion, was a known practice prior to February, 1969. Cruickshank, Tr. at pp. 1073-1078. Further, through the use of an isoprenaline test [56] and a $FEV_1$ test [57], both of which Dr. Cruickshank testified were known tests prior to 1969, a selective dose for atenolol could be determined since these tests could determine the degree of beta$_2$-blockade and, thus, the degree of beta$_1$-selectivity. Cruickshank, Tr. at pp. 1083-1086. The Court finds, however, that reliance on the use of a dose titration procedure in conjunction with the isoprenaline test and the $FEV_1$ test, does not attribute to the '032 patent's specification the teaching of how to select a cardioselective dose. The contrary evidence presented at trial shows that up until 1976 the misconception existed that increasing the dose of atenolol would increase its antihypertensive effect.

Therefore, one skilled in the art, as of February 21, 1969, would not have been taught by the '032 patent specification how to select a dose for atenolol in the treatment of hypertension that is cardioselective. [58]

Finally, ICI asserts that both hydrophilicity [59] and the absence of ISA are inherent properties of atenolol which are not dose dependent, and that the '032 patent adequately teaches a person skilled in the art how to obtain the benefits that result from such properties in the treatment of hypertension. Thadani, Tr. at pp. 195-97; Cruickshank, Tr. at p. 1081. However, there is no indication in the patent as to the hydrophilicity of atenolol. Thadani, Tr. at p. 156.

It is stated in the '032 patent that atenolol lacks ISA. In the book chapter co-authored by Dr. Thadani, entitled "Beta-Blocking Agents", which appears in the book "Drugs for the Heart" by Professor Lionel H. Opie, published in 1984, (DX 524), there is a preference expressed that the ideal beta-blocker would contain ISA. Dr. Thadani explained that there are studies in the literature that indicate that ISA can be beneficial for those patients with compromised heart function or very low heart rates especially elderly patients. In these patients it is not desirable to reduce the heart rate and, as such, it does not do any harm to have some stimulation from the

**56.** The Isoprenaline test is a measure of beta-2 blockade. When isoprenaline is given, the beta-2 stimulation causes an increase in blood flow and a decrease in peripheral resistance which would not be affected by a low dose of atenolol. Cruickshank, Tr. at pp. 1084-85; PX 263.

**57.** The $FEV_1$ test also measures the relative degree of beta-2 blockade. It involves the measurement of forced expiratory volume in one second. Cruickshank, Tr. at p. 1085; PX 504. If there has been a significant degree of blockade of the beta-2 receptors in the bronchi the $FEV_1$ would decrease. Thadani, Tr. at p. 221.

**58.** Dr. Hirschmann also testified at trial that persons skilled in the art as of February 21, 1969 would have known from the patent disclosure itself that the most beta$_1$-selective doses would be at the lower end of the disclosed dose range. He, as did Dr. Cruickshank, interpreted the disclosure of the '032 patent to teach that

selectivity is not absolute and that it relates to dose. Also, in order to maximize selectivity, a person of ordinary skill in the art would want to use the lowest dose that was effective as an antihypertensive. Hirschmann, Tr. at pp. 823-26. It appears that Dr. Hirschmann, like Dr. Cruickshank, believes that the use of dose titration would allow a cardioselective dose to be selected. This, however, still does not take into account the prevailing contrary view at this time that increasing atenolol's dose would increase its effectiveness.

**59.** Hydrophilicity means that the drug is soluble in water. If a drug is hydrophilic it will enter the brain in a lesser concentration and thus the central nervous system as compared to a drug which is soluble in lipids or lipophilic. A lipophilic drug will cross the blood brain barrier into the central nervous system much more easily such that more side effects may be seen with such a drug. Thadani, Tr. at pp. 155-56.

beta-blocker drug.[60]  Thadani, Tr. at p. 70.

### G. *Superior or Unexpected Results of the '032 Patent*

It is undisputed that no beta-blocker was known prior to atenolol that was both cardioselective and lacked ISA.  P.T. Order at III–15; Thadani, Tr. at p. 41; Cruickshank, Tr. at p. 1040.  Atenolol is also a hydrophilic drug.  Thadani, Tr. at p. 155.  ICI's position is that certain unexpected benefits in the treatment of hypertension result from this unique combination of properties.  ICI asserts that because of atenolol's combination of beta$_1$-selectivity and lack of ISA, atenolol is, overall, capable of providing a greater decrease in blood pressure than prior art beta-blockers.  ICI further asserts that the small additional decrease in blood pressure that is achieved with atenolol, may significantly reduce the risk of future stroke and heart attack.  ICI also claims that atenolol's unique combination of cardioselectivity and lack of ISA, together with its hydrophilic nature results in fewer and less serious side effects overall than prior art beta-blockers.  A review of the references and the testimony put forth by ICI in support of each of these asser-

tions, however, does not convince the Court of their veracity.

### 1. Increased Reduction in Blood Pressure

In opposition to the claim by ICI that atenolol provides greater blood pressure lowering capability than prior art beta-blockers, Danbury's expert Dr. Thadani expressed the opinion that in view of his own research and the work of others, all beta-blockers reduce blood pressure to the same degree irrespective of the presence or absence of secondary pharmacological properties such as cardioselectivity and/or ISA.  The Court will have to agree with Danbury that the references cited in support of Dr. Thadani's opinion do indicate that the ancillary pharmacological properties, specifically cardioselectivity and/or ISA, of the beta-adrenoreceptor drugs are of little relevance to the anti-hypertensive activity of these drugs [61] and that such activity of the various drugs is approximately equal.[62]  The Court finds the opinion of Dr. Thadani to be sufficiently supported by credible evidence.

The evidence presented by ICI to show that atenolol offers a significant advantage in the treatment of hypertension by offering a greater blood pressure lowering capa-

**60.** Also in the second edition of "Drugs for the Heart" published in 1987, a preference for ISA is expressed.  It states that atenolol goes a long way to fulfill the requirements of the ideal beta-blocker but cites the lack of ISA as a disadvantage.  Dr. Thadani testified that these statements are based on a review of different articles which were published up to the point of publication or just prior to publication.  Thadani, Tr. at pp. 70–72; DX 525.

**61.** DX 510 at p. 258; DX 512 at pp. 572s–73s; DX 513 at p. 543a; DX 515 at p. 9; DX 516 at pp. 417–20; DX 519 at p. 261; DX 522 at p. 120; DX 523 at pp. 718–19; DX 524 at p. 11; DX 525 at p. 8.

**62.** ICI would have the Court discredit the references cited by Danbury because some of the studies which include clinical data on relative anti-hypertensive effectiveness do not include atenolol and the remainder of the references are simply general observations unsubstantiated by clinical evidence.  In the studies in DX 513 and DX 515, cited by Dr. Thadani, the beta-blocker drug metoprolol was included which is cardioselective and lacks ISA like atenolol.  Thadani, Tr. at p. 58.  The Court will note that Dr.

Cruickshank in assembling his overview PX 410, did not find it unreasonable to use as a surrogate for practolol the beta-blocker drug epanolol which, as he described, is "virtually identical in its pharmacological properties to practolol."  Cruickshank, Tr. at p. 1014.

Dr. Thadani made reference to DX 522 which is his 1983 article entitled "Beta Blockers in Hypertension".  He stated that in reaching the conclusion that all beta-blockers are equally effective, all of the public studies which are based on references were considered and reviewed.  Thadani, Tr. at p. 63.  Dr. Thadani also based his opinion on DX 523 which is an excerpt from the Fifth Edition, 1983, of a publication entitled "AMA Drug Evaluations".  Dr. Thadani testified that this is unbiased information which is critically reviewed.  Thadani, Tr. at p. 65.

ICI is also critical of PX 154 and DX 528 introduced at trial by Danbury in support of the view that ISA does not reduce the effectiveness of a beta-blocker in the treatment of hypertension.  The Court is not convinced that the references presented by Danbury are of so little relevance and credibility as to be ignored.  In reviewing the references cited by Danbury the Court notes that they all contain numerous references to other studies and publications.

bility, was not convincing in the Court's view. Specifically, ICI claims that atenolol lowers diastolic blood pressure to a greater extent than the prior art beta-blockers by an overall difference of about 4 mmHg. ICI's evidence in support of this assertion consists of testimony by its expert witness, Dr. Cruickshank, in reference to the beta-blocker textbook (PX 208) that he co-authored and an overview he compiled (PX 818) and testimony by its expert witness, Dr. Sleight, also in reference to Dr. Cruickshank's overview.

There are problems with this evidence. Some of the testimony given by Dr. Cruickshank is inconsistent with the views expressed in his textbook.[63] Dr. Cruickshank testified that he and his co-author arrived at the conclusion that the difference between atenolol and nonselective drugs in lowering blood pressure was in the area of about 4 mmHg. The textbook (PX 208), however, indicates that some researchers and studies show that beta-blockade is the same for all beta-blockers, while other researchers and studies suggest that the fall in blood pressure is greater and more impressive with a selective beta-blocker, such as atenolol. Thus, the actual conclusion reached was that "[t]he studies showing a greater fall in diastolic blood pressure with beta$_1$-selective drugs show a difference of about 4 mmHg...." Cruickshank, Tr. at pp. 1209–10; PX 208 at p. 74. There is no indication that this conclusion was arrived at as to propranolol.

There were other instances where Dr. Cruickshank's testimony at trial was inconsistent with the views expressed in his 1987 textbook. Dr. Cruickshank agreed that his

position as to the differences between acebutolol and atenolol had changed since his 1987 textbook. Cruickshank, Tr. at pp. 1210–1212. Dr. Cruickshank explained that these changes in position were due to a new database. The Court is not convinced of this reasoning since at trial Dr. Cruickshank admitted that a majority of the studies available to him today which compare atenolol versus propranolol, for example, were available to him in 1987. Also, the additional studies included in the overview which discuss atenolol and acebutolol would not justify Dr. Cruickshank's change in position as to acebutolol. A careful review of the studies comparing acebutolol and atenolol not only undermines Dr. Cruickshank's reasoning for his change in position regarding acebutolol but also demonstrates to the Court the unreliable and perhaps biased manner in which the studies were interpreted and compiled for purposes of the overview. The Court's apprehensions as to the reliability and veracity of the overview is hereafter set forth.

PX 413 is a chart which shows how eight studies comparing atenolol with acebutolol were interpreted by Dr. Cruickshank. A review of these eight studies through the testimony of Dr. Cruickshank showed the following: 1) no difference between acebutolol and atenolol was found; 2) acebutolol was superior; 3) the study itself was invalid; 4) the study was not concerned with blood pressure lowering efficacy; 5) the comments as to the significance of the data by the investigators were ignored; and 6) the manner in which the data was interpreted by Dr. Cruickshank is questionable.[64] Cruickshank, Tr. at pp. 1208–09,

---

**63.** The Court notes that at many times during Dr. Cruickshank's testimony it was difficult to ascertain his meaning, particularly during cross examination, as he became quite adversarial and reluctant to answer questions with either an affirmative or negative response.

**64.** The first study on PX 413 is the Tsukiyama study (PX 244) which found that there was no difference between acebutolol and atenolol. The second study, the Wilcox study (PX 137), the investigator concluded, and Dr. Cruickshank agreed, that the comparison with acebutolol was unfair since acebutolol was probably under-

dosed. However, Dr. Cruickshank included this study in the overview anyway.

The third study, the Neutel study (PX 281), found that acebutolol was superior to atenolol. The fourth study, the De Backer study (PX 282), favored acebutolol. As to this particular study Dr. Cruickshank testified that the data had to be pulled off of graphs with the assumption that the figures were drawn to scale since there was no data elsewhere in the article relating to blood pressure. This study was not aimed at comparing hypertensive effects but was comparing the efficacy tolerance and effect on serum lipids of acebutolol.

1227–54; PX 244, 137, 281, 282, 283, 284, 285, 286, 413.

Dr. Cruickshank created an overview (PX 818) which depicts data points from all the studies and exhibits PX 819–824 which serve as overviews of each individual beta-blocker compared, to support the position that atenolol lowers supine diastolic blood pressure to a greater extent than the prior art beta-blockers by an overall difference of about 4 mmHg. Dr. Cruickshank testified that in his opinion the overview established such a finding. Eighty studies, which compared atenolol with other beta-blockers, were found through ICI records, the Medline Source and the studies quoted in the beta-blocker book (PX 208). The studies were compiled into an overview representing a comparison between atenolol and other beta-blockers. Cruickshank, Tr. at pp. 1006–1009.

The Court finds that there exists problems as to the validity and reliability of this overview. This overview included all studies found which made a comparison between atenolol and other beta-blockers. This is a flaw in the Court's view and impacts on the validity of the overview because studies which are different in design, dose regimens and patient bases are being compared. Dr. Cruickshank ac-

The fifth study, the Sau study (PX 283), Dr. Cruickshank acknowledged is an abstract and not an article. Dr. Cruickshank agreed that many times abstracts are not accepted for publication after a peer review. Dr. Cruickshank also agreed that this study was an open study in which one drug was always given last and that the results from this study should be stricken as this was a poor study and he believed there was an unfair advantage to the last drug given.

The sixth study, the Turner study (PX 284) concluded that the two drugs were equally effective. Dr. Cruickshank, however, believing in his methodology of treatment as to the studies in the overview credited atenolol with a 3.8 difference because of the fact that one or two patients had a better than average response to atenolol.

In testifying about the seventh study, the Costa study (PX 285), Dr. Cruickshank acknowledged that studies which dosed once a day were lumped together with studies in which the dosing was three to four times a day and that the numbers in a study were just put into the overview without any regard for the comments of the investigators as to the statistical significance of the data generated.

knowledged that by including all of the studies, high-quality studies and studies of lesser quality would be involved. Also this meant that studies which measured different blood pressures were included and left undifferentiated.[65] Cruickshank, Tr. at pp. 1007–1009.

ICI attempted, through Dr. Cruickshank and Professor Sleight (its expert witnesses in the field of cardiovascular medicine), to highlight the significance of the apparent difference seen for atenolol in the graphical depiction of PX 818 and to dispel the idea that random error was the cause for such differences. Also it was through these witnesses that ICI attempted to defend the scientific integrity of the overview and establish its lack of bias. Both Dr. Cruickshank and Professor Sleight testified in terms of what is statistically appropriate to do or not do and what is statistically significant or insignificant. The Court finds that neither of these witnesses is qualified to discuss the statistical significance of the results obtained or the validity of methods used in compiling this overview. Cruickshank, Tr. at pp. 1023–27, 1187–91, 1222, 1326–28; Sleight, Tr. at pp. 1347–49, 1355–56, 1394–1400, 1420. This type of testimony was properly within the domain of a statistical expert.[66]

The last study, the Lewis study (PX 286), was aimed at examining psychological side effects and not comparing blood pressure lowering efficacy. The Court found it necessary to thoroughly discuss each of these studies and the associated testimony of Dr. Cruickshank in order to illustrate with just one example, that of acebutolol, the inherent unreliability of the Cruickshank overview due to its methods of data interpretation and inclusion and its disregard for the opinions of the investigators actually involved in the studies.

**65.** Since the majority of the studies measured supine or lying diastolic blood pressure this was the preferred reading and when available was the measurement taken. If a study did not record supine blood pressure then a reading for sitting blood pressure was next preferred and, finally, if all that was available was a standing diastolic blood pressure that was used. Cruickshank, Tr. at p. 1008.

**66.** The Court does not agree with ICI that Professor Sleight's testimony with respect to Dr. Cruickshank's overview analysis is within his

Danbury criticizes the overview for its disregard of the differences in design of the underlying studies and the patient populations studied, which ranged from non-hypertensives to severe hypertensives, and any conclusions reached by the authors of the study in regard to the true significance of the results obtained.[67] The Court believes that these are legitimate criticisms and further undermine the credibility of ICI's claim regarding the 4 mmHg diastolic blood pressure superiority of atenolol.

ICI sought to prove at trial that atenolol, due to its combination of cardioselectivty and lack of ISA, gives it a blood pressure lowering capability which is about 4 mmHg more than the prior art beta-blockers which are non-selective with or without ISA or selective with ISA and that this capability provides significant benefits in the reduction of strokes, coronary heart disease and death. The evidence, however, does not support this 4 mmHg claim of superiority in the treatment of hypertension with atenolol and, thus, the evidence presented at

trial as to any alleged benefits derivative of this claim need not be discussed.[68]

### 2. Increased Reduction in Heart Rate

In further reliance on the combination of properties possessed by atenolol ICI asserts that these properties have clinical significance in atenolol's ability to lower blood pressure through its effect on cardiac output and vascular resistance. Cruickshank Tr. at pp. 960, 998. Dr. Cruickshank explained that, in his opinion, the current belief is that beta-blockers lower blood pressure predominantly by a combination of reductions in cardiac output and vascular resistance.[69] Blood pressure is a product of cardiac output and vascular resistance such that a decrease in either one alone or in combination will result in a decrease in blood pressure. Cruickshank Tr. at pp. 897, 941–943.[70]

According to Dr. Cruickshank different combinations of $beta_1$-selectivity and ISA result in different effects on cardiac output and vascular resistance. He based this opinion on the following explanations: 1) If

expertise. Dr. Sleight's involvement with large clinical trials, and experience in the interpretation of studies and overviews in his cardiology research and his involvement with statisticians as part of his work in cardiology does not, in the view of the Court, qualify him to discuss the statistical aspects of the overview. A statistical expert would be the appropriate expert for such a discussion. Therefore, corroboration by Professor Sleight as to the validity and significance of Dr. Cruickshank's overview is unpersuasive. Sleight, Tr. at pp. 1342–56. Furthermore, Dr. Sleight testified that he did not study any of the underlying reports of the overview and that he was relying totally on what Dr. Cruickshank told him as to these studies and the data generated. This further supports the Court's conclusion that Professor Sleight was in no position to state whether the underlying studies were scientifically valid or if the overview was valid. Sleight, Tr. at pp. 1342–56, 1394.

67. In response to the criticism by Danbury that the studies underlying the overview were not randomized so that atenolol or the comparator drug was always administered following the other, thus favoring the last-administered drug, Dr. Cruickshank recalculated the data, removing all non-randomized studies that might favor atenolol, where atenolol was given last. The mean difference in diastolic blood pressure was recalculated and found to be 3.7 mmHg favoring atenolol which Dr. Cruickshank still characterized as a significant advantage for atenolol.

Thadani, Tr. at pp. 83–86; Cruickshank, Tr. at pp. 1027–29.

68. The Court will not address the evidence presented by ICI in support of its assertion that small reductions in blood pressure lowering provide significant benefits in reduced stroke and myocardial infarction since the Court has determined that the evidence does not support the claim that the diastolic blood pressure lowering capability of atenolol shows an overall benefit of 4 mmHg (revised to 3.7 mmHg) as compared with prior art beta-blockers.

ICI presented evidence through the testimony of Dr. Sleight, summarized on exhibit PX 817, concerning the MacMahon, Collins and Linbald studies (PX 104; PX 125; PX 287). These are studies which investigated the effect of blood pressure on the incidence of stroke and/or myocardial infarction and/or coronary heart disease.

69. *See also* exhibit PX 163 at pp. 2117–18 under the heading "The Pressure–Flow–Resistance Diagram."

70. Dr. Thadani testified at trial that the method by which beta-blockers lower blood pressure is still not known today and that neither the pharmacological properties of ISA or $beta_1$ selectivity have any clinical significance in the ability of a beta-blocker to lower blood pressure. Thadani Tr. at pp. 28, 55.

the beta$_1$-receptors, which predominate in the heart and increase heart rate when stimulated, are blocked by a beta-blocker drug, heart rate will decrease, thereby decreasing cardiac output and blood pressure; 2) If the beta-blocker drug also blocks the beta$_2$-receptors, found predominantly in the bronchi and vessels of the peripheral vascular system, the dilation of these vessels via natural beta$_2$-stimulation is blocked, resulting in constriction of the vessels and an increase in peripheral resistance; 3) If the beta$_1$-receptors are blocked by a beta-blocker having ISA, the heart rate will not be reduced as much as a drug without ISA, because of the partial stimulation from the ISA, resulting in a lesser reduction in cardiac output and blood pressure; and 4) If the beta$_2$-receptors are also blocked, there will also be some stimulation from the ISA which will cause some dilation of the vessels as compared to a drug without ISA. P.t. Order at p. III–15, ¶ 25; Cruickshank Tr. at pp. 899–903, 934–942, 960, 998, 1032; PX 407; PX 911; PX 912; PX 913.

At trial ICI presented Exhibit PX 407 which graphically summarizes the resultant effects from the various combinations of selectivity and ISA as discussed by Dr. Cruickshank. This exhibit represented the theoretical predictions of various combinations of these two properties on the lowering of blood pressure. Exhibit PX 813, a chart taken from PX 163 at p. 2120 a book chapter done by Man in't Veld entitled "Effects of Antihypertensive Drugs on Cardiovascular Hemodynamics", was presented at trial to show that the actual effects of various beta-blockers on cardiac output, heart rate, vascular resistance, and blood pressure were consistent with the predictions in PX 407.

In the Court's view this literature review by Man in't Veld simply confirms that many drugs have been developed for the treatment of hypertension and that the primary aim of such drugs is to reduce blood pressure though the mechanism of action for achieving this goal is different. Also, that among the beta-blocker drugs, specifically, the differences in ancillary pharmacological properties may effect the hemodynamic changes which cause a reduction in blood pressure. In the Court's view this study does not support any conclusion as to a reduction in heart rate and superior efficacy in the lowering blood pressure.[71] Dr. Thadani testified that there is no correlation between reduction or control of blood pressure and the changes in heart rate with different beta-blockers. He further testified that there is no relationship as far as blood pressure control is concerned and ISA or the heart rate and that in hypertension or high blood pressure control, the relevance of heart rate control does not make a difference. Thadani, Tr. at pp. 122–23.

As explained previously by Dr. Cruickshank, blood pressure can be lowered independently of heart rate (i.e. by lowering peripheral resistance). This is in fact the mechanism of blood pressure reduction for many antihypertensive agents such as diuretics and beta-blockers which possess relatively high amounts of ISA such as pindolol. Thadani Tr. at pp. 122–23, Dr. Cruickshank Tr. at pp. 1168–71, 1177–79. Furthermore, the superior blood pressure lowering effectiveness claimed by ICI for atenolol due to its lack of ISA and thus its effect on heart rate is undermined by the fact that this would also be true as to those prior art drugs lacking ISA such as propranolol. The Court does not find that atenolol's lack of ISA and associated effect on heart rate gives it superiority in the treatment of hypertension. Dr. Cruickshank also testified that he finds nothing in the claims of the '032 Patent (PX 3) which says anything about reducing heart rate.

3. Central Nervous System Side Effects

ICI alleges that atenolol's combination of pharmacological properties provides a benefit over the prior art beta-blockers in the treatment of hypertension because, overall, atenolol is associated with lesser side effects and adverse reactions and, thus, pro-

---

71. The Court believes that Dr. Cruickshank was not able to cite any study that indicates the heart rate has anything to do with lowering blood pressure. Cruickshank, Tr. at pp. 1176–78.

vides generally a better quality of life. The side effects associated with beta-blockers can relate directly to their pharmacological properties such as $beta_1$-selectivity, ISA, and hydrophilicity or lipophilicity. However, the side effects can also be unrelated to these properties. Cruickshank Tr. at pp. 1041–47.

It is ICI's position that, in general, the central nervous system ("CNS") side effects are related to the lipophilicity or hydrophilicity of a beta-blocker drug and that because atenolol is a highly hydrophilic drug it will not easily cross the blood brain barrier. Therefore, its concentration level in the brain tissue will be lower in comparison to a highly lipophilic drug such as propranolol, which appears in very high concentrations in the brain and has been associated with a higher level of adverse CNS reactions including sleeplessness, dreams, nightmares, and hallucinations. Cruickshank Tr. at pp. 974–76, 1041–42.

An article entitled "B–Adrenoceptor Blockers and the Blood–Brain Barrier" (PX 130) compared the three lipophilic beta-blockers, propranolol, oxprenolol, and metoprolol to atenolol and found that the three lipophilic drugs appeared in the brain tissue at concentrations 10–20 times greater than that of hydrophilic atenolol. This article concluded, however, that "[t]he low concentration of atenolol in brain tissue is *possibly* responsible for the low incidence of central nervous system-related side effects in patients on this agent compared to lipophilic B-adrenoceptor blockers." PX 130 at p. 549. (emphasis added).

PX 145, a 1990 article by McAinsh and Cruickshank, entitled "Beta–Blockers and Central Nervous System Side Effects," states that it appeared that the occurrence of CNS side effects during the clinical usage of beta-blockers, was related to the relative lipophilicity of a particular drug since a lower incidence of such side effects occurred with atenolol, the most hydrophilic drug investigated. However, in this article the degree of lipophilicity was not deemed to be the only factor responsible for such effects since pindolol is associated with a higher incidence of CNS side effects in comparison to the drug metoprolol, a beta-blocker having a similar degree of lipophilicity as pindolol. PX 145 at pp. 187–188. Danbury cited exhibit DX 527 which is the official "Summary Basis of Approval for TENORMIN" issued by the FDA at the time that it approved the drug known as atenolol which states that "[t]here is evidence that atenolol does not enter the brain, but no evidence at all to indicate that its adverse effects differ from the other beta-blockers because of this." DX 527 at p. 74.

The evidence presented at trial, in the Court's view, shows only that any reduction in CNS side effects with atenolol, in comparison to prior art beta-blockers, is a matter of degree. Other prior art beta-blockers, which are also less lipophilic in comparison to the highly lipophilic beta-blocker propranolol also exhibit less CNS side effects.[72]

ICI further asserts that atenolol provides additional benefits of reduced side effects and adverse reactions due to its pharmacological properties of $beta_1$-selectivity and ISA. Under the headings "Adverse Reactions" and "Potential Adverse Effects" on DX 530, the FDA Approved Label for Atenolol from the Physicians Desk Reference, the same side effects such as fatigue, CNS side effects, dreams, and hallucinations, are listed for atenolol as for any other beta-blocker.[73] Cruickshank, Tr. at pp. 1118–1119. Further, a 1980 report by Dr. Zacharias entitled "Comparison of the Side Effects of Different Beta Blockers in the Treatment of Hypertension," found that in a comparison of some of the "commoner" tolerable side effects of propranolol and atenolol, most importantly cold extremi-

---

72. Dr. Cruickshank testified that since the prior art beta-blocker acebutolol is "modestly" hydrophilic its central nervous side effects would be similar to those of atenolol. Cruickshank Tr. at pp. 1119–1120.

73. Dr. Cruickshank agreed that all beta-blockers exhibit certain side effects that are a result of the function of beta-blockade by beta-blockers. Cruickshank, Tr. at pp. 1131, 1134; PX 145.

ties[74] and fatigue, that there was no significant difference between the two drugs. This report also stated that "there is no startling difference among any of the beta-blockers in this respect." Cruickshank, Tr. at pp. 1124–30; PX 144.

Table 3 of this report indicates that the dose limiting side effects of atenolol[75] tend to increase with an increasing dose. Dr. Cruickshank agreed that any side effects will increase with the dosage of any of the beta-blocker drugs, including atenolol. Further, he would expect the side effects that would be produced if one followed the preferred dose range of the '032 Patent to be higher than if one followed the dose range established by the FDA for atenolol. Cruickshank, Tr. at pp. 1125–1129; PX 144.

PX 145, (referred to above) states that:

The side-effects common to all beta-blockers arise from beta1-blockade such as fatigue and cold peripheries. These side effects may be manifest with hydrophilic agents that are either *beta1-selective (e.g. atenolol)* or nonselective (e.g. sotalol), and with lipophilic agents which are either beta1-selective (e.g. metoprolol) or nonselective (e.g. propranolol).

PX 145 at pp. 163–64. (emphasis added). Dr. Cruickshank agreed that in reference to any side effect differences between acebutolol and atenolol that whatever benefits are derived from beta1-selectivity, both atenolol and acebutolol will exhibit them. Cruickshank, Tr. at pp. 1120–23. However, beta-blocker drugs, even beta1-selective

beta-blockers, are not generally given to asthmatic patients. DX 519; DX 530.

In reference to ISA, Dr. Cruickshank agreed that some studies show that when it comes to the side effect known as cold extremities, beta-blockers with ISA have a positive effect on reducing this side effect. Cruickshank, Tr. at p. 1129. Drugs with partial agonist activity might have an advantage or are at least are preferable with respect to other side effects such as bradycardia (too low a heart rate). Thadani, Tr. at pp. 50–51, 70–77; DX 519; DX 524.

The Court finds that there was sufficient credible evidence produced at trial to support the finding that all beta-blockers produce the same types of side effects and that any differences exhibited between the various beta-blocker drugs are a matter of degree. Some of the studies cited by ICI may indicate that atenolol has less of a particular effect as compared to certain other beta-blocker drugs in some patients, but in the Court's view, the evidence was not sufficient to find that atenolol possesses an unexpected degree of superiority as compared to the prior art beta-blockers with respect to side effects.

### H. *TENORMIN'S and TENORETIC'S Commercial Records*

Robert C. Black, Corporate Vice President with ICI Americas and Vice president of Sales and Marketing for ICI Pharmaceuticals Group,[76] testified concerning the commercial records of TENORMIN[77] and TENORETIC.[78] Mr. Black's responsibili-

---

74. The side effect referred to as "cold extremities" means cold fingers and toes. Cruickshank, Tr. at p. 1129.

75. This is a side effect which limits the dose that you would want to give to a patient yet is not so severe at a lower dose that you need to withdraw the patient from the drug. Cruickshank, Tr. at p. 1127.

76. ICI Americas Inc. ("ICI Americas") is plaintiff ICI's corporate operating subsidiary doing business in the United States. ICI Pharmaceuticals Group is a business unit of ICI Americas which is engaged in the research, development, manufacturing, marketing and sale of pharmaceutical products in the United States. ICI PLC is the corporate entity located in London, England and is the owner of the '032 patent. Black, Tr. at pp. 1426–30.

77. TENORMIN, ICI's brand name for the beta-blocker atenolol, is cardioselective, hydrophilic, lacks ISA and is given in tablet form, once daily for the treatment of hypertension. TENORMIN was approved by the FDA for treating hypertension in August 1981. ICI Americas introduced Tenormin in the United States market for treating hypertension in September of 1981 to a limited physician audience. In October of 1981 a full launch of the product was commenced. Black, Tr., at pp. 1436, 1440, 1441.

78. TENORETIC is the combination of the beta-blocker TENORMIN with the diuretic chlorthalidone. TENORETIC was approved by the FDA for the treatment of hypertension in June of 1984 and was launched by ICI in August of 1984. Black, Tr., at pp. 1479–80.

ties as to these products were essentially the same. His responsibilities included overseeing the promotional activities and marketing campaigns as to these products and the implementation of these through the sales force. Mr. Black is familiar with the general marketplace as to beta-blockers and beta-blocker/diuretic combination drug classes and is aware of the characteristics and claims of competing products in these classes of drugs. Mr. Black characterized the market for these products as extremely competitive and very noisy.[79] Black, Tr. at pp. 1434–37, 1478–81.

Mr. Black testified that in evaluating the sales and overall performances of TENOR-MIN and TENORETIC one should examine the entire life cycle of each product in comparison to the beta-blocker category of anti-hypertensive products (in the case of TENORMIN) and the category of beta-blocker/diuretic combinations (for TENOR-ETIC). It was Mr. Black's opinion that if the entire life cycle of a pharmaceutical product is not examined a very misleading view results because pharmaceutical products have relatively long commercial lives. Thus, in the case of TENORMIN, evaluation should begin in 1981, when it entered the market place, and continue today. In the case of TENORETIC one should begin with its launch date of August, 1982 and continue over its entire life cycle up until today. Black, Tr. at pp. 1442, 1480, 1482, 1483.

It was also Mr. Black's opinion that because each of these products does compete in the anti-hypertensive marketplace, you could conceivably compare them to all of the anti-hypertensive products, regardless of category. However, because that market is so heterogenous, it is better to compare them against the above categories of products (i.e. beta-blockers and beta-blocker/diuretic combinations), in which they re-

ally compete. Black, Tr. at pp. 1442–43. The Court agrees with these opinions of Mr. Black as he has sufficient knowledge and experience concerning the appropriate way to conduct such evaluations.

The Court, however, does not agree with ICI and find that dollar sales data and data as to market share generated from dollar sales is anymore probative or reliable than prescription data and market share data associated with it. Each of these data should be analyzed in assessing a product's performance. Mr. Black testified that both are used and that prescription data is important but that sometimes prescription data can be misleading such that dollar sales numbers are relied upon more heavily. There was insufficient evidence to convince the Court that a preference as to one type of data should exist. Black, Tr. at p. 1444.

With the protocol for evaluating a products performance outlined, the Court will discuss the data presented first as to TEN-ORMIN and then as to TENORETIC. Exhibits 701 and 702 are bar graphs which indicate the share of dollar sales of beta-blockers approved for hypertension for the years 1981 through 1989.[80] The only difference between the exhibits is that 701 has all of the propranolol-containing products combined into one graph and 702 has segregated Inderal and Inderal LA (a slow release form) from the generic propranolols. These graphs show an upward progression in market share for TENORMIN from one and one half percent in 1981, when TENORMIN was launched, to thirty-five point one percent in 1989. As of 1989 TENORMIN had become the leading beta-blocker in terms of market share based on dollar shares. Mr. Black testified that this pattern was indicative of a very successful

**79.** The term "noisy" was used by Mr. Black to describe the market in the sense that there is a lot of promotional activity in the hypertensive marketplace and particularly with the competitive beta-blockers. Black, Tr. at p. 1437.

**80.** The data on these graphs originated from a large external pharmaceutical audit service which is called IMS Americas which offers data

on many aspects of the pharmaceutical industry. It was Mr. Black's opinion that the industry regards this type of data as being extremely reliable. This is the primary source from which ICI Americas obtains its market information for use in evaluating its products' performances. ICI Americas has used such data extensively in evaluating TENORMIN. 1444–1451.

product. Black, Tr. at pp. 1450, 1451, 1453–56.

In 1981, when atenolol was launched, there were three beta-blockers already launched in the marketplace and approved for the treatment of hypertension. They were Inderal [81], Corgard [82] and Lopressor,[83] with Inderal being the market leader at this time.

Mr. Black, in testifying as to exhibits 701 and 702, stated that the propranolol products showed a "steep decline" and that TENORMIN overtook the propranolol-containing products in 1987 in terms of market share.[84] As to Lopressor and Corgard Mr. Black characterized their performances as being "flat" over this period of time. Black, Tr. at pp. 1436, 1453, 1508–09.

Exhibits 703 and 704 are graphs in the same format as 701 and 702 except they indicate share of prescriptions for beta-blockers approved for treating hypertension. This data shows an upward slope for TENORMIN and, again, flat performance for Corgard and a gradual decrease for Lopressor. This data also showed that the propranolol-containing products did have a slightly higher market share based on total prescriptions in 1989 than did TENORMIN. Black, Tr. at pp. 1461–65.

Exhibit 706 [85] is a bar graph showing the share of dollar sales of beta-blocker/diuretic combinations approved for treating hypertension from 1981 through 1989. This graph shows an increase for TENORETIC in overall market share from nine point nine percent, in 1984, to fifty-five point one percent in 1989. Mr. Black testified that by its fourth year of marketing, TENOR-

ETIC was dominating the class of beta-blocker/diuretic combination products and its dramatic increase in market share within a relatively short period of time represents a strong performance and a significant accomplishment. Black, Tr. at pp. 1485, 1489, 1491, 1497.

The evidence put forth by ICI as to the reasons for TENORMIN'S and TENORETIC'S commercial success consisted of the testimony of Mr. Black. The Court finds that Mr. Black's views as to why physicians prescribe any one beta-blocker in favor of another does not carry much weight. His personal experience of working in the field with sales representatives and hearing physicians discuss their experiences with different products is not sufficient to support a finding that it is the properties associated with the products, TENORMIN and TENORETIC, which cause physicians to prescribe these products. Throughout his testimony on the subject of why these products have experienced commercial success, Mr. Black referred to market research studies, but admitted that no such studies have been done with any regularity and that it is an ad hoc process. No such studies were presented by ICI. It is not clear from this record whether once a day dosing, a feature not claimed in the '032 patent, may be the reason for TENORMIN'S success. Black, Tr. at pp. 1497–99, 1543–48; DX 594.

## II. CONCLUSIONS OF LAW

### A. Burden of Proof

35 U.S.C. § 282 [86] creates the presumption that claim 2 of the '032 Patent is

---

**81.** Inderal is the brand name for the beta-blocker propranolol. Black, Tr., at p. 1438.

**82.** Corgard is the brand name for the beta-blocker natolol. Black, Tr. at p. 1439.

**83.** Lopressor is the brand name for the beta-blocker metoprolol. Black, Tr. at p. 1438.

**84.** The Court will note, however, that this description as to the performance of the propranolol products may be somewhat exaggerated and distorted by the fact that lower cost generic sales are combined with higher-price Inderal sales. The Inderal patent expired in 1985. Black, Tr. at pp. 1507–09.

**85.** The data as to TENORETIC also originated from IMS data. ICI Americas uses this data to assess TENORETIC'S commercial success. Black, Tr. at p. 1484.

**86.** 35 U.S.C. § 282 provides, in pertinent part, as follows:

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a pat-

valid and imposes the burden of proving invalidity by clear and convincing evidence on the attacker, Danbury. *Rohm and Haas Co. v. Mobil Oil Corp.*, 718 F.Supp. 274, 312–313 (D.Del.1989), *aff'd*, 895 F.2d 1421 (Fed.Cir.1990); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The presumption of validity is never weakened, *ACS Hospital Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1574–75 (Fed.Cir.1984), and the burden of proving invalidity never shifts from the party asserting invalidity. *American Hoist & Derrick Co.*, 725 F.2d at 1359–60. Though the burden of proof is not reduced and the presumption of validity remains the same, meeting this burden may be facilitated when the challenger relies on pertinent prior art not considered by the PTO. *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 973 (Fed.Cir.1986). Likewise, sustaining this burden of proof may be more difficult when the prior art evidence relied upon by the challenger is the same as that considered by the examiner. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1359 (Fed.Cir.1983). However, "[t]here is no legal authority for the view that the court must first determine that prior art in an evaluation of obviousness is more pertinent than the prior art considered by the PTO."[87] *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571–72 (Fed. Cir.), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). "Any relevant evidence, whether more or less pertinent, can be considered in an analysis of obviousness." *Id.* at 1572 n. 6.

■ Once the challenger has established a legally sufficient prima facie case of invalidity then the patentee may present evidence to rebut invalidity. All of the evidence of invalidity and any evidence rebutting invalidity is examined by the Court in determining whether the patent is invalid by clear and convincing evidence. *Rohm and Haas Co.*, 718 F.Supp. at 313. The Court has evaluated the evidence presented in this case by applying these principles.

### B. Obviousness: 35 U.S.C. § 103

■ Obviousness is a question of law. *Panduit Corp. v. Dennison Manufacturing Co.*, 810 F.2d 1561, 1567–68 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). The basis of Danbury's attack on the validity of claim 2 of the '032 Patent is 35 U.S.C. § 103 which provides that a patent may not be obtained for an invention "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103 (1988).

■ In making a determination of obviousness the Court's analysis must include the following factual inquiries as discussed in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966):

(i) the scope and content of the prior art;

(ii) the differences between the prior art and the claims at issue;

(iii) the level of ordinary skill in the pertinent art;

---

ent or any claim thereof shall rest on the party asserting such invalidity. 35 U.S.C. § 282 (1988).

87. ICI asserts that Danbury has failed to present any prior art more pertinent than that already considered by the Patent Office in allowing the claims of the '032 Patent and, thus, the presumption of validity is of special significance and it is more difficult for Danbury, as the party asserting invalidity, to carry its burden of proof. PFC at p. 195. The Court is aware that while it must

"give 'appropriate consideration and weight' to the PTO's decision, its decision is not controlling nor binding on the court [and that] the courts can and do decide differently from the PTO examiner" based on the evidence presented to a court at trial. *Badalamenti v. Dunham's Inc.*, 680 F.Supp. 256, 260 (E.D.Mich.1988), *aff'd without opinion*, 862 F.2d 322 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1047, 109 S.Ct. 1955, 104 L.Ed.2d 425 (1989).

(iv) secondary considerations such as commercial success, long felt but unsolved needs, failure of others, etc.

*Uniroyal Inc.*, 837 F.2d at 1050. The Court was mindful of these factors when making its findings of fact.

### 1. The Scope and Content of the Prior Art

■ The Court's thorough discussion of the prior art appears *supra*, at Part I.B.1–3. An examination of the prior art in this case shows that as of February, 1969, there was an established class of chemical compounds referred to as the aryloxypropanolamines. This class was known to possess beta-blocking activity. The members of this class of compounds all possessed the common and necessary "R–ABC" structure of which the "BC" side chain was responsible for the affinity of the compound to the receptor site. The differences exhibited among members of this class are contained in the R or R–A portion of the necessary structure. It is these variations that are responsible for secondary pharmacological properties of a compound, such as cardioselectivity and ISA.[88]

The documentary evidence and testimony at trial also showed that this class of compounds was associated with anti-hypertensive utility. The Court agrees with the defendant that the prior art would have created an expectation in one of ordinary skill in the art that the compound atenolol, as a member of this class, could be used to treat hypertension. The argument by the Plaintiff that such an expectation would not exist because the value of using beta-blockers to treat hypertension was in "controversy" is not persuasive. PFC at p. 67.[89] There may have been papers which did not show dramatic results in the reduction of blood pressure with the use of a beta-blocker but this does not alter the fact that the prior art patents and literature would create the expectation that a beta-

blocker compound, such as atenolol, would have anti-hypertensive utility.

Further, the prior art references must be considered in their entirety as recognized by both the Defendant and the Plaintiff. PFC at p. 203, ¶ 23; DFC at p. 76, ¶ 88. Parts of a reference can't be discounted because they may be unfavorable to a certain position. Both the utility statements in the prior art patents as well as the clinical evidence in the prior art scientific literature must be examined in determining whether an anti-hypertensive utility was disclosed for beta-blocker compounds. The Court rejects the idea that the prior art patents' disclosures as to activity and utility should be given little weight in assessing any expectation as to utility that the prior art may contain. Hirschmann, Tr. at pp. 772–77, 826–27, 850–73. Finally, whether persons of ordinary skill in the art in February, 1969 would have had the ability to predict beforehand whether a new beta-blocker compound would have sufficient potency for anti-hypertension usefulness is not reflective of whether one of ordinary skill in the art would have a reasonable expectation that such a compound would be useful in the treatment of hypertension. PFC at pp. 69–70, at ¶ 117; Hirschmann, Tr. at pp. 775–78, 821–22. Potency relates to the level of activity of the compound in terms of the amount of a compound needed to get a desired effect. LeCount, Tr. at p. 464.

### 2. The Differences Between the Prior Art and the Claims at Issue

The prior art in this case defines a class of beta-blocker compounds and contains much information as to this class of compounds. The prior art suggests that this class of beta-blocker compounds has usefulness in the treatment of hypertension. In terms of structure-activity relationships associated with the class, the prior art sug-

---

**88.** All three chemical experts, Dr. Rees, Dr. Hirschmann and Dr. Loev confirmed that such a characterization of these compounds as a class existed and that the class was associated with a common structure and activity. Dr. LeCount also testified about this. Loev, Tr. at pp. 286–311; LeCount, Tr. at pp. 484–86; Rees, Tr. at pp. 684–85; Hirschmann, Tr. at pp. 872–73.

**89.** ICI points to passages at pages 780 and 785 in DX 505, an article by Dollery et al. entitled "Clinical Pharmacology of Beta-receptor-blocking Drugs" published in 1969.

gests not only the requisite structure necessary for beta-blocking activity but the portions of this structure which can tolerate modification without a resultant loss of beta-blocking activity. Further, the prior art indicates that quite diverse modifications can be tolerated in the modifiable portions without a loss of either beta-blocking activity or usefulness in the treatment of hypertension.

Viewed against this background the differences between the "R" groups of atenolol and practolol would not seem significant. Each compound possesses the requisite R–ABC structure and their respective "R" groups are isomeric. The Court concludes that the prior art, taken as a whole, creates a reasonable expectation that atenolol would be a beta-blocker and, thus, be useful in the treatment of hypertension. Only a "reasonable expectation" that such activity would result is necessary, not "absolute predictability." *Rohm and Haas Co.*, 718 F.Supp. at 303. *See also In re O'Farrell*, 853 F.2d 894, 903–04 (Fed.Cir. 1988); *In re Longi*, 759 F.2d 887, 897 (Fed. Cir.1985).

Though "[s]tructural similarity, alone, *may* be sufficient to give rise to an expectation that compounds similar in structure will have similar properties," *In re Merck & Co.*, 800 F.2d 1091, 1096 (Fed.Cir.1986) (emphasis added), this Court, like the Board in *Merck*, is not basing its conclusion of obviousness on structural similarity alone. As discussed previously in this Opinion, the teachings in the prior art gave directions as to which portions of the R–ABC structure could tolerate modification and the scope of such modifications. In addition, the prior art teachings included the teachings of techniques, such as bioisosteric replacement to implement such modifications.

In *Merck*, the additional teaching of the prior art that the precise structural difference between amitriptyline and imipramine involved a known bioisosteric replacement provided a sufficient basis for the expectation of the beneficial result. *Id.*, at 1097.[90]

The difference between the "R" group of practolol and that of atenolol involves, as was testified to by Dr. Loev, a known bioisosteric replacement. This, along with structural similarity, leads to a "reasonable expectation" that the desired activity will result.

#### a. *In Re Kuehl*

The case of *In re Kuehl*, 475 F.2d 658 (C.C.P.A.1973), resembles the present case in that it involves the use of a novel compound, specifically a novel zeolite, identified by the symbol ZK–22. The claims are directed to a hydrocarbon conversion process which involves the "use" of ZK–22 as a catalyst to crack hydrocarbons. The Court finds the reasoning of this case to be particularly instructive as to the proper resolution of the present case.

In *Kuehl*, the only prior art of record, the Frilette Patent, disclosed a class of crystalline zeolites useful as catalysts for cracking hydrocarbons. This class was described as "crystalline metal aluminosilicates" known as molecular sieves, which have catalytic capabilities due to their structure. Molecular sieves of the "A" series are taught by Frilette to be members of the class of zeolites which are useful as catalysts for cracking hydrocarbons.

The CCPA, on appeal, reversed the Patent Office Board of Appeals' affirmance of the examiner's rejection of the claims for obviousness. The Court found that:

ZK–22 is not so similar to the zeolites of the "A" series identified by Frilette as to render the use of ZK–22 to crack hydrocarbons, albeit in the *manner* used by Frilette, obvious to one of ordinary skill in the art. ZK–22 is not a homologue, isomer, or chemical analogue of series "A" zeolites. Nor do Frilette's teachings of zeolites broadly define a class, the knowledge of which would render ZK–22 or its use as a catalyst obvious. Furthermore, the differences therebetween appear significant.

*Kuehl*, 475 F.2d at 663 (emphasis in original). The Court in *Kuehl* made the deter-

---

**90.** The instructiveness of *Merck* is not diminished by the fact that it involved an alleged new use for a known compound and this case involves an alleged new use for a novel compound.

mination as to "[t]he obviousness of the process of cracking hydrocarbons with ZK–22 as a catalyst ... without reference to knowledge of ZK–22 and its properties." *Id.* at 665.

This Court has also made the determination as to the obviousness of using atenolol to treat hypertension without reference to knowledge of atenolol and its properties. In the present case, however, there exists a significant structural similarity and a vast amount of information in the prior art concerning this structure, which was lacking in *Kuehl.* Unlike *Kuehl,* the prior art teachings of beta-blockers, in the present case, define a class, the knowledge of which this Court finds renders atenolol's use for the treatment of hypertension obvious. The Court did not find that the prior art was such as to warrant characterizing the various prior art beta-blockers as members of different "series", as was done by some of ICI's expert witnesses.

Atenolol is not significantly different from the prior art members of the class. As is the case with the other compounds in this class, atenolol is distinguishable because it has a different "R" substituent and/or "A" group. Furthermore, atenolol is an isomer of the prior art beta-blocker practolol.

### b. *Unexpected Properties*

■ Any unexpected or superior properties and results of the claimed invention not shared by the prior art, are relevant in evaluating obviousness. *In re Dillon,* 919 F.2d 688, 692–93 (Fed.Cir.1990) (*in banc*), *cert. denied sub nom. Dillon v. Manbeck,* —— U.S. ——, 111 S.Ct. 1682, 114 L.Ed.2d 77 (1991); *In re Chupp,* 816 F.2d 643 (Fed. Cir.1987). Danbury has the burden of establishing by clear and convincing evidence, the claimed invention's lack of such results. *American Hospital Supply Corp. v. Travenol Laboratories, Inc.,* 745 F.2d 1, 8 (Fed.Cir.1984). The Court finds that Danbury presented sufficient evidence to meet this burden.

The evidence presented does not support ICI's claim that atenolol produces unexpected results, such as increased reductions in blood pressure and heart rate and a lower incidence of CNS side effects, when used to treat hypertension. The evidence merely indicates that, as to these claims, the difference between atenolol as compared to other beta-blockers are either nonexistent or represent a slight difference in degree. *See supra* Part I.G.1.–3.

### 3. The Level of Ordinary Skill in the Pertinent Art

■ The Federal Circuit has provided the Court with the following list of factors to assist it in its determination of the level of ordinary skill in the art. The factors that may be considered are:

  (i) the educational level of the inventor;

  (ii) the type of problems encountered in the art;

  (iii) the prior art solutions to those problems;

  (iv) the rapidity with which innovations are made;

  (v) the sophistication of the technology; and

  (vi) the educational level of the active workers in the field.

*Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 696 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). The Federal Circuit has given the courts further guidance as to this determination by explaining that "[n]ot all [of the factors listed above] may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.* at 696–97. Assessing the ordinary level of skill in the art is necessary to "adhere to the statute, i.e., to hold that an invention would or would not have been obvious as a whole, when it was made, to a person of 'ordinary skill in the art'—not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand." *Id.* at 697; *See also, Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.,* 807 F.2d 955, 962 (Fed.Cir. 1986).

Applying the factors to the present case, the Court finds that a person of ordinary skill in the art would be an individual with a PhD degree in organic chemistry, with an emphasis in medicinal chemistry and expe-

rience with the techniques of drug development in general and specific experience with the development of beta-blockers. This definition seems to reasonably characterize the theoretical ordinary level of skill in the art based on the factors of *Environmental Designs.*

### 4. Secondary Factors

■■■■ Commercial success, long felt but unsolved needs, and failure of others are examples of secondary considerations a court may consider in its determination of the question of obviousness to "give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham,* 383 U.S. at 17–18, 86 S.Ct. at 694.[91] Such objective evidence of secondary considerations must be considered by the court before a conclusion on obviousness/nonobviousness is reached. *Panduit Corp.,* 810 F.2d at 1570; *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1380 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281, 306 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986). However, evidence as to these factors does not control the conclusion as to obviousness. *Newell Companies v. Kenney Manufactoring Co.,* 864 F.2d 757, 769 (Fed.Cir.1988), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989). Objective evidence of nonobviousness is assigned weight based upon the nature of the evidence and its relationship to the merits of the claimed invention. *See, e.g., Demaco Corp.,* 851 F.2d at 1392–94; *Ashland Oil, Inc.,* 776 F.2d at 306; *Simmons Fastener Corp. v. Illinois Tool Works, Inc.,* 739 F.2d 1573, 1575 (Fed.Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985). If the evidence of secondary considerations is to be given substantial weight by the court in its determination of the obviousness issue it must be established that a nexus exists between the

merits of the claimed invention and such evidence. *See Demaco Corp.,* 851 F.2d at 1392; *Ashland Oil, Inc.,* 776 F.2d at 305; *Stratoflex Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538–39 (Fed.Cir.1983). Mindful of these principles the Court has considered ICI's objective evidence as to the following: 1) atenolol's unexpected advantages over the prior art beta-blockers in the treatment of hypertension (*See supra* Part II.B.2. for the Court's conclusion as to this evidence); 2) commercial success of TENORMIN and TENORETIC; 3) the pharmaceutical industry's acquiescence in the validity of the '032 Patent; and 4) the alleged deliberate copying of atenolol by Danbury.

■■■■ ICI seeks to rely upon commercial success as objective evidence of nonobviousness. "A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent." *Demaco Corp.,* 851 F.2d at 1392. ICI contends that it has shown commercial success and the requisite nexus between this commercial success and the method of use claimed in the '032 patent through evidence as to its products, TENORMIN and TENORETIC.

Through the testimony of Robert C. Black, Corporate Vice President with ICI Americas and Vice President of Sales and Marketing for ICI Pharmaceuticals Group, ICI established that both TENORMIN and TENORETIC occupy a substantial share of the United States market for beta-blockers and beta-blocker/diuretic combinations approved for use in treating hypertension. It was shown that each of these products has experienced substantial sales in this market and that each is associated with a steady increase both as to sales and market share. The Court would note, however, that as to some of Mr. Black's interpretations of the data, there were instances where the sig-

---

**91.** Citing *Graham* the Federal Circuit explained that the rationale for considering evidence of "secondary considerations" is to provide the Court with objective evidence of how the patented invention is viewed in the marketplace, by those interested in the invention. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1391 (Fed.Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988).

nificance of the data was exaggerated and other instances, in reference to other beta-blockers where all of the relevant circumstances (i.e. the availability of low cost generics) were not taken into consideration. Nevertheless, the Court finds that ICI has presented sufficient evidence to show that TENORMIN and TENORETIC are commercially successful. The record, however, does not establish that there is a sufficient relationship between the commercial success of these products and the method of use claimed in the '032 patent.[92]

The evidence presented by ICI in support of its claims that Danbury deliberately copied TENORMIN and TENORETIC and that the pharmaceutical industry has acquiesced in the validity of the '032 Patent was very limited. The evidence was insufficient to prove these claims or to establish that there was a nexus between these claims and the merits of the method of use claimed in the '032 Patent.

### 5. Conclusion as to Obviousness

In light of the explicit teachings of the prior art as to the functional, structural, and utility aspects of the beta-blocker class of compounds, the structural similarities between atenolol and the prior art, the suggestions in the prior art as to techniques to make the modifications necessary to obtain atenolol, atenolol's lack of unexpected properties and advantages over the prior art beta-blockers in the treatment of hypertension, and the lack of a nexus between the commercial success of TENORMIN and TENORETIC and the merits of the claimed invention, the invention in claim 2 of the '032 Patent would have been obvious to one of ordinary skill in the art when the invention was made on February 21, 1969.

### C. *Section 112*

Danbury's second attack on the validity of claim 2 of the '032 Patent is based on 35 U.S.C. § 112 which provides in pertinent part:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112 (1988). Danbury alleges that the specification of the patent in suit fails to include an adequate disclosure of how to use the invention without undue experimentation and thus is invalid under 35 U.S.C. § 112. DFC at pp. 71–72.

As set forth in *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed.Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987), enablement is a legal determination of whether a patent, as of the filing date of a patent application, enables one skilled in the art to make and use the claimed invention. However, a patent "need not teach ... what is well known in the art." *Id.* Some experimentation is permissible "although the amount of experimentation needed must not be unduly extensive." *Id.* A determination as to whether undue experimentation is necessary in order to teach those skilled in the art to make and use the invention "is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *In Re Wands*, 858 F.2d 731, 737 (Fed.Cir.1988). "The test is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed...." *Ex parte Jackson*, 217 USPQ 804, 807 (Bd.App.1982).

---

92. Assuming ICI had established a prima facie case of nexus, the Court's conclusion that the invention claimed would have been obvious, would not have been altered. "[E]vidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." *Stratoflex, Inc.*, 713 F.2d at 1539. Although this evidence "must be considered, [it does] not control the obviousness conclusion." *Newell Companies, Inc.*, 864 F.2d at 768.

Guided by these principles the Court reviewed the evidence presented to decide whether the amount of experimentation required to enable one skilled in the art to select an effective dose of atenolol and obtain anti-hypertensive effectiveness, was excessive as Danbury asserts or a matter of the exercise of routine skill. DFC at p. 72. Based on the Court's thorough discussion and findings as to the teachings of the '032 Patent, it is the Court's conclusion that the requisite experimentation in this case was excessive.

ICI's own actions prior to the issuance of the patent in suit and subsequent to its issuance support such a conclusion. No testing as to atenolol's blood pressure lowering capability was conducted prior to the filing of the patent application by ICI yet the patent contains a dosage range of "between 25 mg and 1,200 mg daily, preferably between 200 mg and 600 mg daily at doses spaced at 6–8 hourly intervals...."[93] This dose range is a broad disclosure, from 1 to 48 times, and is very high in comparison to the dose range of 50 mg to 100 mg approved by the FDA. The Court was not persuaded by the evidence presented by ICI that atenolol is effective in the treatment of hypertension throughout the entire range contained in the patent. Nor did the Court find ICI's contention that one skilled in the art seeking to determine an effective dose in February of 1969 could have selected a dose anywhere within the range recited in the '032 patent and been able to obtain hypertensive effectiveness persuasive.

This high dose was apparently the result of reliance on the belief during the initial clinical evaluations of atenolol between 1972 and 1976 that it possessed a dose response similar to that of propranolol. The existence of the belief, that high doses of atenolol were needed to achieve the goal

blood pressure, contradicts Dr. Cruickshank's testimony that an effective dose could be determined by the use of the technique of "dose titration".[94] Cruickshank, Tr. at pp. 1098–1116. The belief that the dose response of atenolol would be the same as that of propranolol influenced the clinical study of atenolol up until 1976 in respect to higher dose amounts and frequency of administration in patients.[95] It was not until several years of dose studies had been conducted with atenolol that a much lower dose of 100 mg, given once daily, was determined to be the effective dose for achieving the benefit of cardioselectivity. This determination was based on the discovery that the plasma half life of a beta-blocker, such as atenolol, was exceeded by its pharmacological half life such that the blood pressure lowering effect persisted for a long time after the concentration of a beta-blocker in the bloodstream disappeared. Cruickshank, Tr. at pp. 1098–116; Thadani, Tr. at pp. 141–49; PX 153.

This discovery, responsible for the effective dose regiment of atenolol, represents the result of substantial experimentation such that the requirement of an adequate disclosure of 35 U.S.C. § 112 has not been satisfied. The reasonable amount of guidance which may make a considerable amount of experimentation permissible is not present in this case. *See In Re Wands*, 858 F.2d at 737. On the contrary, the patent disclosure would not offer guidance but misdirect one attempting to determine an effective dose. In terms of both quantity of dose and frequency of administration, the patent states the dose range being used for propranolol as of the filing date of the patent in suit. Cruickshank, Tr. at pp. 1111–1116; PX 3; PX 142; DX 530. The disclosure of the '032 patent specification would not have enabled one skilled in the art, without undue experimentation, to practice the invention of claim 2.

**93.** PX 3, at column 5, line 54.

**94.** Using the same principle of dose titration as was used with propranolol, Dr. Zacharias in the early seventies would quickly increase the daily doses of atenolol up to the thousand milligram range in an effort to get even better blood pressure lowering results since this approach had

previously been successful with propranolol. Cruickshank, Tr. at pp. 1072–73, 1109–1111; PX 150 at p. 113.

**95.** Cruickshank, Tr. at pp. 1098–1116; PX 152; PX 141; PX 208 at p. 378; PX 153; PX 3; PX 142; DX 530.

### III. Conclusion

For the foregoing reasons, the Court concludes claim 2 of the '032 patent is invalid under 35 U.S.C. §§ 103 and 112.